Floyd Reeland, as Executor, etc., of Charles J. Reeland, Deceased, and Others, Appellants, Respondents, *v.* Moore Oil Company, Inc., and Another, Respondents, Appellants, Impleaded with The Union Pipe Line Company and Another, Respondents.

Fourth Department, November 21, 1934.

*Mapes & Utter* [*E. A. Mapes* of counsel], for the appellants.

*Quigley & Vedder* [*J. P. Quigley* of counsel], for the defendants Moore Oil Company, Inc., and Penn Petroleum Company.

*Francis B. O'Connor*, for the defendants The Union Pipe Line Company and Sinclair Refining Company.

LEWIS, J. Plaintiffs seek an injunction restraining defendants from entering upon certain lands in Allegany county, N. Y., for the purpose of drilling and operating oil wells. As incidental relief an order is sought declaring all oil-producing equipment, belonging to the defendants and now upon the land, to be the property of the plaintiffs. The complaint also asks for an accounting of the proceeds of oil taken from the premises and demands damages against defendants for withholding possession of the property from the plaintiffs.

The action was commenced by Charles J. Reeland, now deceased, and has been continued by his executors. Upon the trial the learned Special Term dismissed the complaint against defendants The Union Pipe Line Company and Sinclair Refining Company and denied the injunctive relief sought by plaintiffs, except in so far as the judgment restrains defendants Moore Oil Company, Inc., and Penn Petroleum Company from operating oil well No. 186 which had been drilled within thirty feet from plaintiffs' well No. 9. The judgment also awards nominal damages to the plaintiffs and restrains defendants from conducting further drilling operations nearer existing wells than a reasonable distance, as defined therein.

In discussing the facts we shall disregard the defendant Penn Petroleum Company, which has been made a party defendant solely because it owns all the outstanding capital stock of Moore Oil Company, Inc.

On December 5, 1898, James M. Curtiss owned a tract comprising two hundred ninety acres of land located upon lots 63 and 64 in the town of Bolivar, Allegany county, N. Y. On that date he entered into a written lease with Charles J. Reeland granting the exclusive right to drill for and gather oil or gas upon said premises, the consideration being the delivery to the lessor of one-eighth of all oil and gas which might be recovered from the land. The only description of the lands affected by the lease is as follows: " All that tract or parcel of land situate in the town of Bolivar, Allegany Co., N. Y., lot No. sixty-four in said town, being that part of said lot heretofore not drilled for oil purposes, and such portion or part of

said lot the wells on which has (*sic*) been pulled out as the party of the first part may wish the second party to drill and operate for oil purposes owned by first party. No wells shall be drilled within 200 feet of the buildings on lot No. 64 nor within 300 feet of any oil producing well on said lot 64."

The lease was not recorded. For many years it was lost and for a period of more than thirty years its provisions were not made known to subsequent grantees of the land and those otherwise interested in the property. The description of the leasehold was not given by metes and bounds nor did it state the total acreage. Evidence given upon this subject is at best fragmentary and falls short of that quality of proof which is essential to accurate location. From the map in evidence, made in 1930, it appears that the leased land comprised an area of about sixty-three acres which was hexagonal in shape, its longest dimension, from northwest to southeast, being about 3,000 feet and its greatest width about 1,000 feet.

In December, 1898, Curtiss, the lessor, was operating a number of wells in the central and northwestern portion of this tract. Within a month after the date of the lease Reeland commenced operations in the undrilled southeasterly portion, far removed from the nearest Curtiss producing well. The drilling of this first well apparently convinced Reeland that the sands in the southerly portion of the tract were not oil-bearing for within the next three years he moved his drilling operations toward the northwest and made seven borings at sites near the Curtiss wells.

In the meantime Curtiss had died and on February 1, 1902, his heirs transferred the fee of lots 63 and 64 to Justin D. Bradley and another, subject to any oil-drilling rights which had been previously granted to a number of lessees, including Charles J. Reeland. The deed, however, gave no further description of the drilling rights so reserved.

On April 10, 1902, Reeland had moved his operations into the northwesterly section of the tract where Curtiss wells were producing. There he drilled well No. 9, with which we are concerned upon this appeal. The evidence clearly discloses that the site of this well was within a section which, within the terms of the lease, had been " drilled for oil purposes " and in fact was within the vicinity of four Curtiss producing wells.

In June, 1906, Martin Moore, who had occupied the property under contract for a number of years, acquired the title to lots 63 and 64 from Bradley. There is evidence that during such occupancy Moore notified Reeland he would no longer be permitted to drill upon the land. It is said Reeland replied, " All right, you can drill the property." However that may be, there is proof that thereafter

for a period of twenty-one years during Moore's ownership, Reeland did nothing to develop oil production on the tract and offered no objection to the drilling operations conducted by Martin Moore. On April 15, 1927, Moore transferred lots 63 and 64 to John J. Heberle who, on September 1, 1927, conveyed the same to the defendant Moore Oil Company, Inc., subject to the terms and conditions of any lease affecting the same.

Having acquired the fee to this property, the defendant Moore Oil Company, Inc., at once commenced active oil recovery operations on an extensive scale. It drilled numerous wells in the northwestern section and stimulated production by employing the "restored pressure" or "flooding" system by which water was injected into the oil-bearing sands under such a pressure as to force the oil into wells from which it was pumped.

During these years of the Moore company's operations upon lot 64, Reeland remained as quiescent as he had been during the prior twenty-one years of the Moore ownership. He offered no objection to the application of defendant's flooding method for recovering oil nor did he make any attempt to stop the removal of oil from the premises. For a period which now extended over twenty-five years, he had done nothing to develop oil production upon the tract. He was apparently satisfied to pump his own twelve wells which, from 1921 to 1926, yielded a total output of less than one barrel a day. Reeland was incapacitated by illness for several years, but the evidence shows that on a number of occasions he came upon the property where drilling operations were in progress, and that he had knowledge, gained through his son, as to the methods of oil production which were in use there.

On December 30, 1929, after nearly two years of active drilling, during which the defendants had recovered more than 12,000 barrels of oil from the premises, Charles J. Reeland served written notice upon the defendants that he was the owner of an oil and gas lease covering said tract and asserted that oil had been withdrawn from that property without his permission. The notice called upon defendants to cease operations at once and to vacate the premises; it further demanded that they pay him seven-eighths of the value of all oil withdrawn from the property since drilling operations were commenced. It is claimed this notice by Reeland was prompted by his finding the unrecorded lease which had been given by Curtiss in 1898. The complaint in this action was served promptly following said notice.

There is a rule of law, which had its origin in litigation involving the exploitation of oil lands, that a lease of rights to occupy land for the purpose of prospecting for oil is not a grant of the oil in the land.

It gives title to that oil only which is extracted from the earth and is reduced to possession by the prospector. (*Wagner* v. *Mallory*, 169 N. Y. 501; *Priddy* v. *Thompson*, 204 Fed. 955.) Under that rule we hold that Reeland acquired title to that oil only which he recovered from the earth and reduced to his own possession. His right to exclude others from the sixty-three acre tract depended upon a continuance of his efforts to prospect for oil upon the premises. So long as he, in good faith, proceeded to drill wells and exploit the land for oil, he had the right to possession of the premises for such exploitation subject to the conditions of the lease. When his efforts to that end ceased, he forfeited his right to possession under the lease, except those areas surrounding the producing wells which he had drilled and from the production of which he continued to pay one-eighth thereof as a royalty to the fee owner.

In *Eaton* v. *Allegany Gas Co.* (122 N. Y. 416) the facts of which are quite parallel to those of the case at bar, it was ruled (p. 422): " Undoubtedly the lessees had the right of possession so long as they, in good faith, were engaged in boring wells or testing the oil-producing capacity of the land. But when it was demonstrated that oil could not be obtained, or when they should abandon their search, their right to possess the property would end and thereafter they would have no more right to occupy it than a stranger."

It cannot be held in the instant case that Curtiss intended by his lease to Reeland to divest himself and his grantees of their rights to oil *in the land* without regard to whether Reeland chose to continue his efforts toward development of the tract for oil production. The purpose of the lease by Curtiss, the landowner, as in the usual agreement of its kind, was to exploit his property for oil; the consideration was a fractional part of the production of any wells which might be drilled. The argument is not convincing that Reeland, with only a leasehold interest, had the right to cease exploitation of the land, which was still oil-bearing, and to preclude exploitation by a remote grantee of the fee, who took title twenty-three years later.

It is significant that in 1907, three years after Reeland drilled his last well, Martin Moore drilled three productive wells, with Reeland's knowledge, which plaintiffs admit were located within the bounds of the leasehold. The importance of this evidence is that it proves Reeland had not exhausted the possibilities of the tract when he discontinued his exploitation of the land in 1904. Having ceased prospecting for oil upon the tract which still had productive possibilities by employing facilities then known and in common use, Reeland abandoned his lease, except as to those wells drilled and

operated by him. (*Eaton* v. *Allegany Gas Co., supra; Conkling* v. *Krandusky*, 127 App. Div. 761.)

We also conclude that the conduct of Reeland during those years when Martin Moore and the defendant Moore company were drilling the tract, works an estoppel against the present claims by plaintiffs that defendants' operations were without Reeland's permission and, therefore, in violation of his rights. With knowledge of those rights and of what was being done upon the land, he had remained silent over a long period of years. If he had rights under the lease, not known to others, which precluded drilling by Martin Moore and his successors in fee, he should have objected to any oil recovery operations upon the land. Instead, while large expenditures were being made by the owners to promote oil production, he offered no objection by either act or word. Conduct so inconsistent with the claim now made does not appeal to the equitable powers of the court. (*Thompson* v. *Simpson*, 128 N. Y. 270, 291; *Rothschild* v. *Title Guarantee & Trust Co.*, 204 id. 458, 461; *Wendell* v. *Van Rensselaer*, 1 Johns. Ch. 344, 353.) What we have said upon estoppel does not apply to Reeland's operation of those wells which he had drilled and maintained in production or to those areas immediately tributary thereto.

We withhold our approval of that part of the judgment which awards nominal damages to the plaintiffs and restrains defendant Moore Oil Company, Inc., from drilling closer to plaintiffs' existing wells than a " reasonable distance," as defined therein. We find no evidence as to the distance which should properly separate wells upon the Reeland leasehold; nor is there proof as to the several areas drained by plaintiffs' wells. Upon this branch of the case the opinion which accompanied the decision herein states: " There is no positive proof before me from which I can find as to what distance one well should be from another so as to not unreasonably interfere with the material flow." If there is a minimum distance which should separate wells upon the Reeland leasehold to avoid interference with production, there should be evidence fixing such distance before a restraining order issues such as that contained in the judgment. The defendants are restrained from drilling closer than a " *reasonable distance* " from any of the existing Reeland wells and it is provided that " the term ' reasonable distance ' as herein used shall be interpreted to mean such distance as a man experienced in the development of oil lands would regard as proper for the most efficient production of oil upon this tract taken as a whole." We conclude that to adopt " reasonable distance," as thus defined, as the unit of measure will lead to future litigation instead of terminating this controversy. If a judgment in this

action is to bring about a practical, working plan by which the future conduct of the parties affected may be guided, which may well be the aim of any decree in equity, it should express a definite rule which, as near as possible, is proof against future legal strife. Such a rule requires evidence, not found in the present record, which will fix definitely the minimum distance from plaintiffs' producing wells within which the defendant Moore company will be restrained from drilling, pumping or "flooding" as a means of oil recovery. The plaintiffs contend that such a minimum distance is already a matter of record in the case. They refer to the restriction of three hundred feet in the Curtiss lease. It is argued that Reeland "had a right to rely on his lease and the location of his wells fixed by Curtiss under the terms of the lease, and that the distance for spacing of wells was fixed by the lease itself." It is further asserted that "it was not necessary for plaintiffs to make any further proof on the question;" that "the burden was upon defendants to show that a different distance should properly prevail." Without discussing at this time the merits of such an argument, we point to a finding, by the trial court, to which the plaintiffs have not excepted, that after Curtiss died, Charles J. Reeland drilled and operated three wells (two of which are still producing) within the prohibited distance of 300 feet from wells formerly operated by Curtiss. This undisputed evidence amounts to a practical construction by Reeland that he did not recognize the restriction of 300 feet as binding upon him after the death of the lessor Curtiss. Again the inconsistency of plaintiffs' claim weakens their position in a court of equity.

As a basis for enjoining the defendants from operating well No. 186 the trial court has found that the effect of drilling it within thirty feet of plaintiffs No. 9, "was to render Reeland No. 9 worthless to such an extent that it was abandoned in about one year." We find no evidence which adequately supports that finding. There is proof by one of the plaintiffs that in the years 1930 and 1931 the output of Reeland No. 9 diminished and that he stopped pumping it two years after well No. 186 was drilled. But we fail to find the essential proof of causation by which to connect such abandonment with any fault of the defendants. We have not overlooked the testimony from one of the defendants' witnesses that the site of defendants' well No. 186 was chosen to take advantage of the water pressure which the Moore company had applied to oil sands north of that location. It may be it was so located as to benefit more than Reeland No. 9 from defendants' "flooding" operations but it does not follow from the proof before us that the effect of drilling No. 186 "was to render Reeland No. 9 worthless to such an extent that it was abandoned in about one year." If

in fact the discontinuance of well No. 9 was not from natural diminution of oil supply, but by reason of some breach of duty by the defendant Moore Oil Company, Inc., the burden of proving causation, by experts or from other sources, was upon the plaintiffs. They have not sustained that burden.

Accordingly that part of the judgment, from which plaintiffs appeal, except the award of damages, should be affirmed; that part of the judgment from which defendants Moore Oil Company, Inc., and Penn Petroleum Company appeal should be reversed on the law and the facts and an interlocutory judgment should be granted in favor of the plaintiffs and against the defendants providing for an injunction restraining the defendants from conducting further oil recovery operations by drilling, pumping or flooding, within such a distance from plaintiffs' present producing wells, and for such time as production therefrom is upon a paying basis, as would materially interfere with oil recovery therefrom. The case should be remitted to the Special Term for further proof before it or a referee to be appointed for that purpose, to determine: (1) The minimum distance from each of plaintiffs' twelve wells which were producing on September 1, 1927, within which oil recovery operations by drilling, pumping or flooding could have been conducted without material interference with oil production therefrom; (2) what damages, if any, were suffered by Charles J. Reeland, or his estate, by reason of oil recovery operations conducted by defendant Moore Oil Company, Inc., within such minimum distance. Upon findings to be made from evidence taken within the scope of such inquiry the Special Term should direct the entry of a final judgment for injunction, and for damages, if any are found, without costs.

Findings of fact numbered XC, CIX, CX, CXII, CXXVIII and conclusions of law numbered IV, VIII, IX and X, ru ings upon plaintiffs' proposed findings numbered 16, 42, 43 and 51 and plaintiffs' proposed conclusion of law numbered 13, are disapproved. As defendants' proposed findings of fact and conclusions of law and rulings thereupon are not included in the record before us, we cannot review the same.

All concur. Present — SEARS, P. J., EDGCOMB, THOMPSON, CROSBY and LEWIS, JJ.

Judgment so far as appealed from by plaintiffs (except damages) affirmed; so far as appealed from by defendants reversed on law and facts and interlocutory judgment directed and matter remitted to Special Term to determine certain facts and damages and to enter final judgment, without costs. All with costs of this appeal to defendants, appellants. Certain findings of fact and conclusions of law disapproved and reversed.