David WISER, Elizabeth Wiser, Donald Heller, Judith Heller, Charles Lampman, Helen Lampman, David Ruston, Christopher Ruston, Steven Minacci, Eric Kessler, City Brook Properties, LLC, Roger Reed, Margie Reed, Audrey Livermore, Daniel Murphy, Marjorie Johnson as agent for Ruth Johnson, Daniel Wiser, and Glenda Murphy, Plaintiffs,

v.

ENERVEST OPERATING, L.L.C., Belden & Blake Corporation, and Chesapeake Appalachia, L.L.C., Defendants.

Civil Action No. 3:10–CV–794(TJM/DEP).

United States District Court, N.D. New York.

March 22, 2011.

Peter H. Bouman, Esq., Robert R. Jones, Esq., Coughlin & Gerhart LLP, Binghamton, NY, for Plaintiffs.

Thomas S. West, Esq., Yvonne E. Hennessey, Esq., The West Firm, PLLC, Albany, NY, for Defendants.

## DECISION AND ORDER

DAVID E. PEEBLES United States Magistrate Judge.

In late 1999 and early 2000 the plaintiffs, all of whom own property in this district, entered into virtually identical oil and gas leases with defendant Belden & Blake Corporation ("B & B") permitting exploration for and recovery of oil, gas, and other hydrocarbons on the lessors' respective premises. Each of those leases was for a primary term of ten years, but was subject to indefinite extension for so long thereafter as covered product was recovered in paying quantities from the lessors' property. In the initial term of the leases B & B was required to pay annual delay rentals, in advance, in relatively modest amounts commencing after an initial ninety-day period and extending until such time as work for the drilling of a well was commenced.

In July of 2008, the governor of the State of New York State issued a memorandum requiring that the state perform an environmental study of the effects of horizontal drilling into shale formations through use of high-volume hydraulic fracturing, a relatively new technology, and one of several commercially viable methods for recovery of natural gas.[1] Defen-

---

1. Hydraulic fracturing, also referred to as "fracking", is a well stimulation process used to maximize the extraction of underground resources like oil, natural gas, and geothermal energy. *See http://water.epa.gov/type/ groundwater/uic/class2/hydraulicfracturing/*

dants, who for present purposes are united in interest and jointly represented, contend that the governor's July 2008 memorandum resulted in a *de facto* moratorium on the use of fracking and therefore represents a force majeure, as defined in the parties' lease agreements, and as such has the effect of indefinitely extending the terms of those leases, which otherwise would have expired by now, until such time as that moratorium is lifted.

As framed by the pleadings, at its core .the parties' dispute concerns whether the state's position concerning the use of fracking does in fact constitute a force majeure as contemplated by the parties when entering into their lease agreements—an issue not yet ripe for disposition. As a subsidiary, threshold matter, the parties have sought the court's determination of whether the defendants' failure to make delay rental payments resulted in automatic termination of those agreements, notwithstanding a separate lease provision precluding the finding of a default absent notice and an opportunity to cure, or whether, assuming the existence of a force majeure, the requirement of making delay rental payments was obviated as a result of the alleged moratorium.

For the reasons set forth below, I find that the occurrence of a force majeure, if any, during the primary term of plaintiffs' leases but prior to commencement of drilling does not end the requirement to make delay rental payments, and that the lessee's failure to make the required delay

rental payments after that resulted in automatic termination of the leases. Accordingly, I find that the plaintiffs are entitled to a judgment declaring that the leases in dispute are null and void and no longer in effect.

## I. BACKGROUND

The plaintiffs in this action are all residents of the State of New York, and owners of property located within Broome County. Second Amended Complaint (Dkt. No. 27) ¶¶ 2, 6. Collectively, the land owned by them totals in excess of 1,000 acres and is situated above several geological formations containing natural gas and oil, including the Marcellus Shale, Trenton Black River, Oriskany, Herkimer, and Utica formations. Second Amended Complaint (Dkt. No. 27) ¶¶ 6, 10.

Between October 29, 1999 and February 15, 2000, the plaintiffs entered into tenyear leases with B & B permitting the exploration for gas and oil on their properties, and affording the lessee the right to extract gas, oil, or other hydrocarbon substances indefinitely for as long as they are produced in paying quantities and royalty payments are made to the lessors, and provided that royalty-generating production commences within the ten-year primary lease term. *See generally,* Hennessey Decl. (Dkt. No. 33-4) and Defs' Stmt. of Material Facts (Dkt. No. 33-3). The leases, which are all identically worded for purposes of the pending motions, provide for payment to the lessors of three dollars

*wells_hydrowhat.cfm* (site last visited on March 20, 2011) (screen shot attached). When used for gas drilling, the process releases gas that is tightly trapped in small pours of shale using a mixture of water, chemicals, and propping material, such as sand, which is pumped into the well at high pressure to create fractures in the rock. *See www.dec.ny. gov/energy/46288.html* (site last visited on March 20, 2011) (screen shot attached).

While these documents do not contain any information that affect the determination of the parties' motions, the court notes that publically available documents are properly considered by the court and entitled to judicial notice in connection with the action. *See* Federal Rules of Evidence 201; *see also, Wilson v. Limited Brands, Inc.,* 08 CV 3431, 2009 WL 1069165, at *1 n. 1 (S.D.N.Y. April 17, 2009).

per acre as a signing bonus, and established twelve and one-half percent as a royalty rate for both gas and oil.[2]

Four separate provisions of the agreements are implicated in this action. The first of those is the habendum clause,[3] which governs the lease's duration and provides for a primary term of ten years from the date of the lease and for so long thereafter as oil, gas, or other substances covered thereby are produced in paying quantities from the leased premises or the lands pooled therewith. Hennessey Decl. (Dkt. No. 33–4) Exh. A at ¶ 3.

The second provision at issue requires payment of delay rentals to compensate the lessor for any lag in drilling beyond ninety days from the date of signing, providing that the lease is made on the condition that it will become null and void and all rights thereunder shall cease and terminate unless work for the drilling of a well is commenced on the leased premises or lands pooled therewith within ninety days from the date of the lease, or unless the lessee pays to the lessor, in advance, every twelve months until work for the drilling of a well is commenced a specified rental amount for each twelve-month period during which the commencement of such work is delayed. Hennessey Decl. (Dkt. No. 33–4) Exh. A at ¶ 6.

The third potentially relevant section of the leases is a default clause. That provision requires notice of a default in payment or performance to be provided to the lessee and a thirty-day opportunity to cure the default. Hennessey Decl. (Dkt. No. 33–4) Exh. A at ¶ 14.

A fourth key provision of the parties' leases governs force majeure events and provides that in the event "drilling or other operations are delayed or interrupted by storm flood, fire, or other acts of God, war, rebellion, insurrection, riot, strikes, differences with workmen or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, or regulation of the government, or as a result of shortage in material or equipment", the time of such delay or interruptions shall not be counted against the lessee, the lease will not terminate, and the lessee can not be held liable in damages for failure to comply with the provisions of the lease if compliance is prevented by such force majeure. Hennessey Decl. (Dkt. No. 33–4) ¶ 13.

In July of 2008 then—New York State Governor David Paterson directed the Department of Environmental Conservation ("DEC") to undertake a formal public environmental review process in order to update its 1992 Generic Environmental Impact Statement ("GEIS") for the oil, gas and solution regulatory mining program in New York. Amended Answer (Dkt. No. 29) Counterclaim ¶ 14. The purpose of the ordered study was to address the new high-volume hydraulic fracturing process for extracting natural gas more efficiently. Amended Answer (Dkt. No. 29) Counterclaim ¶ 14. The governor's memorandum seemingly did not prohibit horizontal or vertical drilling for oil and gas utilizing conventional, low-volume, hydraulic fracturing, and left open the possibility for any

---

**2.** According to the plaintiffs, rural land comparable to theirs and located within the Marcellus Shale formation is currently being leased at a rate of between $5750 and $7000 per acre in bonus payments, and with royalty rates of between twenty and twenty-five percent of production income.

**3.** A habendum clause, which is typically found in standard oil and gas leases such as those at issue, is used to fix the duration of such a lease. *Jacobs v. CNG Transmission Corp.*, 332 F.Supp.2d 759, 765 n. 1 (W.D.Pa. 2004) (citing 2 Summers, THE LAW OF OIL & GAS § 281).

entity to apply to the DEC for a permit allowing horizontal drilling in the Marcellus Shale formation after conducting an independent, site-specific Environmental Impact Statement ("EIS").[4] *See* Amended Answer (Dkt. No. 29) Counterclaim ¶¶ 14, 15, and 20; *see also* Defs' Interrog. (Plfs' Exh. 2, Dkt. No. 31–4) at ¶¶ 26–27. Defendants contend that the governor's July 2008 memorandum effected a *de facto* moratorium on exploration of the Marcellus Shale formation utilizing horizontal high-volume fracking, which represents a force majeure within the contemplation of the parties' leases.

The original ten-year primary term of each of the leases in this case has now expired. Plfs' Stmt. of Material Facts (Dkt. No. 31–7) ¶ 8. During the primary term, no wells, exploratory or otherwise, were drilled on any of the leased properties; the only activity conducted by the defendants on those premises has been seismic testing which occurred during the early years of the leases. Defs' Counter–Stmt. of Material Facts (Dkt. No. 37–2) ¶¶ 4, 5.

Up until December of 2008, defendants made the required delay rental payments to the plaintiffs in advance of each lease year. *See id.* at ¶¶ 10, 11. No delay rental payments were made, however, in 2009 in advance of the last year of the primary terms of each of the plaintiff's leases.[5] *See id.* at ¶ 11. Tenders of delay rentals were made to the plaintiffs in or about December of 2010, after defendants became aware, through their effort to file an amended complaint adding this claim, of the plaintiffs' contention that the failure to make timely, advance payments of delay rentals during the primary terms of the leases, notwithstanding the effect of the force majeure clause, rendered the leases automatically null and void. *Id.* at ¶¶ 17, 18. Those tenders were rejected by the plaintiffs.

## II. *PROCEDURAL HISTORY*

Plaintiffs commenced this action on July 2, 2010. Named as defendants in plaintiffs' original complaint were B & B and Enervest Operating L.L.C., the operating company for defendant B & B. Chesapeake Appalachia, L.L.C. has since been named as an additional defendant in subsequently-filed amended complaints.[6] In their

---

**4.** The governor's memorandum is not included in the record before the court, and I was unable to locate that document utilizing publicly available sources. The court's research indicates that the July 2008 directive was followed by the issuance of a formal executive order on December 13, 2010, reiterating the need for further study and recognizing that no permits would be issued prior to completion of a final supplemental GEIS ("FSGEIS"). *See* Executive Order No. 41 at *http://www.dec. ny.gov/energy/46288.html* (screen shot attached).

**5.** On or about December 7, 2009, counsel for two of the plaintiffs, Stephen Minacci and Christopher Rustin, sent a letter to defendants complaining that delay rentals had not been paid. Plfs' Stmt. of Material Facts (Dkt. No. 31–7) ¶ 12. During oral argument of the pending cross-motions, defendants' attorney acknowledged that in the event of a court finding that rental payments continued to fall due during the pendency of the force majeure hiatus, those two lessees have satisfied the provisions of the notice and default section of the agreement, and their leases should be deemed terminated. They reject plaintiffs' contention, however, that the notices from those two plaintiffs should suffice to have placed defendants on notice as to their default with regard to their fellow lessor-plaintiffs.

**6.** On August 1, 2010, after commencement of this action, B & B assigned all of its interests in plaintiffs' leaseholds to defendant Chesapeake Appalachia, L.L.C. Defs' Stmt. of Material Facts (Dkt. No. 33–3) ¶ 34. For purposes of the pending cross-motions, both parties have assumed that the three named defendants are united in interest, and I have done likewise.

original and first amended complaints, plaintiffs sought a declaration that their leases with the defendants had expired due to expiration of the ten-year primary terms and that they are therefore terminated and cancelled of record. In their second amended complaint, plaintiffs have added a claim asserting that, separate and apart from the effect of the primary term expiration, the leases became null and void upon B & B's failure to make required delay rental payments. Defendants have counterclaimed requesting a declaration that the governor's July 2008 memorandum qualifies as a force majeure for purposes of the relevant lease provision and results in an extension of the primary lease term until completion of the SGEIS process. Amended Answer (Dkt. No. 29) ¶¶ 30–32 and wherefore clause.

Currently pending before the court in connection with this action are cross-motions for summary judgment, both addressing the issue of defendants' failure to make delay rental payments. Dkt. Nos. 31, 33. A hearing was conducted in connection with the parties' cross-motions on March 4, 2011, at which time decision was reserved.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v.

Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is warranted only in the event of a finding that

---

Although it does not appear relevant to the issues now before the court, B & B has also conveyed to Talisman Energy USA, Inc., formerly known as Fortuna Energy, Inc., all geological rights in plaintiffs' lands from one hundred feet below the base of the Oriskany formation to the pre-cambrian basement. See id. at ¶ 34.

no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507–08 (2d Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

Where, as here, the parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.*, 360 F.Supp.2d 432, 434 (D.Conn.2005).

## B. *Governing Legal Principles*

 The parties are in agreement that New York law governs the oil and gas leases in dispute. Although in some states oil and gas leases are considered "real property", under New York law they constitute personal property.[7] N.Y. Gen. Constr. Law § 39; *see also Backar v. Western States Producing Co.*, 547 F.2d 876, 881 (5th Cir.1977). At common law, such leases were interpreted as conveying the right to occupy land for the purpose of prospecting for oil or gas, giving title only to the mineral that is extracted from the earth to the prospector. *Reeland v. Moore Oil Co.*, 242 A.D. 462, 465–66, 275 N.Y.S. 489, 493–94 (4th Dep't 1934). The construction and interpretation of gas and oil leases is thus guided by the fundamental principles of contract law. 17 Richard A. Lord, WILLISTON ON CONTRACTS § 50:57 (4th ed. 2010); *see also Estate of Hatch v. Nyco Minerals Inc.*, 245 A.D.2d 746, 747, 666 N.Y.S.2d 296, 298 (3rd Dep't 1997).

### 1. *New York Contract Law*

 Under the cardinal principle for construction and interpretation of contracts in New York, the intention of the parties controls. *SR Int'l Bus. Ins. Co. v. World Ctr. Props., LLC*, 467 F.3d 107, 125 (2d Cir.2006). "[T]he best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, i]t must be enforced according to the plain meaning of its terms.'" *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002)). Accordingly, the threshold question of law for the court is whether the contract it issue is ambiguous. *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465–66 (2d Cir.2010) (citations omitted). "An ambiguity exists where the ... contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir.2000) (internal quotation marks and citation omitted). The grant of summary judgment is inappropriate where the disputed language of a contract is ambiguous. *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010) (citing *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir.2006)).

 "Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of

---

7. New York General Construction Law § 39 provides, in relevant part, that "[o]il wells and all fixtures connected therewith, situate on lands leased for oil purposes and oil interests, and rights held under and by virtue of any lease or contract or other right or license to operate for or produce oil, shall be deemed personal property."

the contract." *Postlewaite v. McGraw–Hill, Inc.*, 411 F.3d 63, 67 (2d Cir.2005) (citing *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 794 N.E.2d 667 (2003)). Where consideration of a disputed clause in the context of the entire agreement resolves any ambiguity, the contract is unambiguous and its meaning can be determined as a matter of law. *Law Debenture Trust*, 595 F.3d at 467. When construing contractual provisions, courts must be mindful of the New York principles of law that "[c]ontracts should be viewed in the light in which they were made", *Postlewaite*, 411 F.3d at 69, and "interpretations that render contract provisions meaningless or superfluous [are disfavored]," *Manley v. Am-Base Corp.*, 337 F.3d 237, 250 (2d Cir. 2003). Additionally, as a general matter, a contract will be construed against its drafter since the drafter is responsible for any ambiguity. *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 142 (2d Cir.2005) (citing *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir.1999)); *see also Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir.2000) (citations omitted).

In this instance, neither side claims that the leases at issue are ambiguous, and the fact that the parties urge differing interpretations in this litigation does not, in and of itself, render otherwise plain language unclear. *Law Debenture Trust*, 595 F.3d at 467. Indeed, both plaintiffs and defendants have moved for judgment as a matter of law, based upon their respective beliefs that the relevant contractual language is clear. The issue thus presented is one for the court, turning on the unambiguous terms of the agreements in dispute.

### 2. Gas and Oil Leases

There is a dearth of authority in New York relating to oil and gas leases such as those now at issue. Both sides to this litigation have therefore identified cases from other jurisdictions where the law concerning such leases is far more developed, though not necessarily uniform, and have asked that the court draw upon the principles emanating from those cases.

An early New York appellate decision observed that "[o]il [and gas] leases or contracts stand on an entirely different basis from any other leasehold agreements." *Conkling v. Krandusky*, 127 A.D. 761, 112 N.Y.S. 13, 17 (4th Dep't 1908) (citing *Eaton v. Allegany Gas Co.*, 122 N.Y. 416, 25 N.E. 981(1890)). They are made in the context of a highly technical industry, which employs distinct terminology used by those in the business. *Jacobs v. CNG Transmission Corp.*, 332 F.Supp.2d at 764 (citing *Daset Mining Corp. v. Ind. Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584, 592 (1984)). For this reason, an understanding of the development of the industry is critical when construing the terms of an oil and gas lease. *Jacobs*, 332 F.Supp.2d at 764.

The standard form oil and gas lease has evolved over the time due, in part, to conflicts that have arisen between landowners and lessees. *Id.* at 764 (citing Howard R. Williams & Charles J. Meyers, OIL AND GAS LAW § 601 (2003 ed.)). Modern oil and gas leases typically include several key provisions, including, for example, the "granting clause," the "habendum clause," the "delay rental clause," and the terms of surrender. *Jacobs*, 332 F.Supp.2d at 764–65 (citing Howard R. Williams & Charles J. Meyers, OIL AND GAS LAW § 603 (habendum clause), § 605 (granting clause), § 641 (royalty clause), and § 611 (dry whole cessation and drilling provisions); 2 W.L. Summers, THE LAW OF OIL AND GAS (Perm. ed. 1959) at Chapter 7 (granting clause); Chapter 10 (habendum

clause) and Chapter 11 (drilling, rental and surrender clauses))'. Two of the key provisions that are critical to the court's determination of the pending cross-motions are the habendum clause and the delay rental clause.

At first, oil and gas leases typically granted the lessee company the right to drill for the purpose of producing oil and gas for a definite, or primary term, and set forth the manner in which the landowner would be compensated. *Hite v. Falcon Partners*, 13 A.3d 942, 946–47 (Pa.Super.Ct.2011). This version came to be viewed as disadvantageous to the oil and gas producing companies, particularly when production started late in, or extended beyond, the term of the lease. *Id.* (citing *Jacobs*, 332 F.Supp.2d at 765 n. 1, 786 n. 15). Eventually, such leases began to incorporate the modern habendum clause which typically provides that the interest conveyed by the lease exists for a prescribed term of years, and "as long thereafter as" or "so long as" a specified product or products are obtained from the land in paying quantities, or some other specified activity continues. *Hite*, 13 A.3d at 946–47 (citing *Jacobs*, 332 F.Supp.2d at 765 n. 1). "Such clauses were typically understood to establish a definite (or primary) term in which the lessee was permitted to develop the property, with an option for an indefinite secondary term permitting the lessee to reap the long-term value and return on the money spent developing the property during the primary term." *Hite*, 13 A.3d at 946 (citing *Jacobs*). Because courts came to imply an obligation to immediately develop the property or suffer forfeiture in such leases, oil and gas producing companies started to also include "delay rental" clauses; these provisions have the effect of relieving the lessee of the duty to develop the property immediately upon entering into the agreement and instead allow lessees, at their option, to avoid termination of the lease in the primary term by making rental payments. *Id.* at 946–47 (citation omitted).

■ In this historical context, the delay rental provision has a well established meaning; as one court observed,

> [i]t is customary for parties to an oil and gas lease to agree that a minimum advance royalty shall be paid for the lessee's right to forego immediate development of the leasehold for production. Such advance minimum payments are in the nature of liquidated damages for the lessee's decision to forego production and are viewed as the consideration paid to the landowner in lieu of the royalty that would be paid if production operations were to be undertaken immediately.

*Jacobs*, 332 F.Supp.2d at 785 (citing *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 388 (1986)). In general, the purpose of the delay rental clause is to allow the lessee to maintain the lease during the primary term expressed in the habendum clause without having to immediately commence development. *Hite*, 13 A.3d at 946–48 (citations omitted). In accordance with this intention, some courts have interpreted delay rental payments to be limited to the primary term of the lease. *Id.* (citing *Jacobs*, 332 F.Supp.2d at 785); *see also* 3 Nancy Saint–Paul, SUMMERS OIL & GAS § 20:1 (3d ed.).

■ Delay rental clauses may take varying forms, including what is known as an "unless" clause. *See Phyfer v. San Gabriel Dev. Corp.*, 884 F.2d 235, 238 (5th Cir.1989). A typical "unless" clause will provide that if drilling has not commenced on a certain property or well by a specified date, the

> lease *shall terminate* ... *unless* the lessee on or before that date shall pay ... to the lessor ... the sum of _____

dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for [_____] months from said date.

*Id.* (citing 3 Kuntz, OIL AND GAS § 29.2 (1967)) (emphasis in original). Most jurisdictions hold that the "unless" clause has the effect of imposing a special limitation, resulting in lease termination if certain acts are not performed by the lessee; the lessee is required to drill wells within a certain period or make periodic rental payments, and unless it does one or the other, the lease terminates.[8] *Valentine Oil Co. v. Powers,* 157 Neb. 71, 59 N.W.2d 150, 159 (1953) (citing and quoting Restatement, Property § 23) ("The term 'special limitation' denotes that part of the language of a conveyance which causes the created interest automatically to expire upon the occurrence of a stated event, and thus provides for a terminability in addition to that normally characteristic of such interest."); *see also* 3 Nancy Saint–Paul, SUMMERS OIL AND GAS § 20:1; *Phyfer,* 884 F.2d at 238; *Rice v. Hillenburg,* 13 Kan.App.2d 155, 766 P.2d 182, 184 (1989); *Phillips Petroleum Co. v. Curtis,* 182 F.2d 122, 125 (10th Cir.1950). " 'An oil and gas lease containing the 'unless' clause confers an optional right upon the lessee, and should be strictly construed in favor of the lessor and against the lessee, and time is of the essence of the contract.' " *Valentine Oil,* 59 N.W.2d at 159 (quoting *Fritsche v. Turner,* 133 Neb. 633, 276 N.W. 403 (1937)); *accord Conkling,* 112 N.Y.S. at 16 (stating "time is the essence" in an oil lease).

 With regard to the issue presented, it appears that the weight of authority among cases construing "unless" clauses favors a finding that if the lessee fails to

either drill, or pay or tender the rental on or before its due date, the lease automatically terminates without any further action on the part of the lessor. *Rice,* 766 P.2d at 185 ("Courts have been substantially unanimous in holding that if a lessee fails to pay or tender the rental on or before the due date under an 'unless' oil and gas lease, the lease terminates automatically."); *Phyfer,* 884 F.2d at 238 (quoting 3 Kuntz, OIL & GAS § 29.2) ("A contract containing such an 'unless' clause does not oblige the lessee to drill or pay a rental fee, ... [and] by its terms, terminates automatically, '*ipso facto,* without necessity of demand or notice on the part of the lessor[.]' "); *Petroleum Engineers Producing Corp. v. White,* 350 P.2d 601, 604 (Okla.1960) ("[I]t is settled law that [an unless] lease terminates without affirmative action on the part of lessor upon lessee failing to either commence a well or pay delay rentals within the period provided in the lease."); *Phillips,* 182 F.2d at 125 ("Under an 'unless' lease the lessee has an option to continue the lease in force by paying the stipulated rental on or before the designated date, and it is subject to termination at his will, which privilege he may exercise by a failure to commence a well or pay the rental within the time stipulated in the lease, in which case the lease automatically terminates."); *Valentine Oil,* 59 N.W.2d at 159 (finding that an unless lease terminates without any action being required by the lessor or the lessee and that the termination is "automatic and self-operating").

### C. *Application to the Facts of this Case*

 The leases at issue in this case are unquestionably "unless" leases. The ha-

---

8. It appears that other courts view the habendum clause as creating not a special limitation, but "an estate on condition subsequent creating only a right of entry in the grantor.

With such an estate the grantor must bring an action to cause forfeiture of the estate." *Danne v. Texaco Exploration and Prod., Inc.,* 883 P.2d 210, 213 (Okla.Ct.App.1994)

bendum clause, found at paragraph 3, provides as follows:

> TERM—Subject to the other provisions contained herein, this lease shall be in force for a primary term of ten (10) years from the date of this lease and for so long thereafter as oil, gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise maintained pursuant to the provisions hereof.

Hennessey Decl. (Dkt. No. 33–4) Exh. A at ¶ 3. The habendum clause is modified by the rental clause, which provides that absent drilling, the lessee has the option to continue the lease during the primary term by the payment of delay rentals. This provision, embodied in paragraph 6 of the lease, utilizes language typical of the "unless" lease, providing:

> RENTAL PAYMENT—This lease is made on the condition that *it will become null and void* and all rights hereunder shall cease and *terminate unless* work for the drilling of a well is commenced on the leased premises or lands pooled herewith within ninety (90) days from the date of this lease and prosecuted with due and reasonable diligence, *or unless* the Lessee shall pay to the Lessor, in advance, every twelve (12) months until work for the drilling of a well is commenced, the sum of $_____ [calculated on the basis of number of acres] for each twelve (12) months during which the commencement of such work is delayed.

Hennessey Decl. (Dkt. No. 33–4) Exh. A at ¶ 6 (emphasis added). Accordingly, by the clear and unequivocal terms of the leases in issue, as universally understood in the oil and gas industry, they automatically terminate in the event that the lessor fails to commence drilling of a well or timely pay delay rentals within the primary term of the leases.

In their motion, plaintiffs ask the court to invoke the "unless" clause and declare the leases null and void based upon defendants' failure to timely pay delay rentals. Plfs' Notice of Motion (Dkt. No. 31). Each of the leases in question was made on a different date, ranging from between October 1999 and February 2000. *See* Hennessey Decl. (Dkt. No. 33–4) ¶¶ 3–13 and Exh. A. There is no dispute that the defendants have never commenced drilling operations on any of the properties at issue. *See* Defs' Counter–Stmt. of Material Facts (Dkt. No. 37–2) ¶ 5. As a result, because delay rental payments could not extend the leases beyond their primary ten-year terms, *Hite*, 13 A.3d at 946–48—a legal premise which defendants readily acknowledge—the leases terminated by their own terms, as dictated by the dates each respectively commenced, between October 2009 and February 2010, absent some basis for finding otherwise.[9]

According to the defendants, the *de facto* moratorium on the DEC's issuance of permits to authorize high-volume hydrofracking for the purposes of drilling gas wells in Marcellus Shale constitutes a force majeure within the meaning of the leases and provides a basis for extension of the leases in dispute beyond their ten-year primary terms. Defendants have therefore sought partial summary judgment, requesting the court find that, "*assuming* that a force majeure event occurred during the primary term and persists to date . . . [,] the leases have been extended into their secondary terms and remain in full force

---

**9.** Defendants admit that no delay rental payments were made to any plaintiff in December of 2009 as advance payments for the year 2010, Defs' Counter–Stmt. of Material Facts (Dkt. No. 37–2) ¶ 11, and plaintiffs have not argued that the leases terminated before then.

and effect." [10] Defs' Reply Memorandum (Dkt. No. 37–1) p. 8 (emphasis in original). Unfortunately for defendants, there is no basis in either the law or the leases in dispute for such a finding.

### 1. *The Force Majeure Clause*

■ The habendum clause dictates the duration of the lease. *Sun Operating Ltd. P'ship v. Holt,* 984 S.W.2d 277, 286 (Tex. Civ.Ct.App.1999) (citing *Gulf Oil Corp. v. Southland Royalty Co.,* 496 S.W.2d 547, 552 (Tex.1973)). To be sure, where, as here, the language of the habendum clause clearly makes that provision "subject to" other provisions in the agreement, depending on the specific language of the lease, the life of the lease may be subject to modification. *Sun Operating,* 984 S.W.2d at 286.

The force majeure clause contained within the plaintiffs' leases provides as follows:

> FORCE MAJEURE—When drilling or other operations are delayed or interrupted by storm flood, fire, or other acts of God, war, rebellion, insurrection, riot, strikes, differences with workmen or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order or regulation of the government, or as a result of shortage in material or equipment, or as a result of any cause whatsoever beyond control of the Lessee, the time of such delay or interruptions shall not be counted against Lessee, anything in this lease to the contrary notwithstanding. This lease shall not be terminated in whole or in part, nor Lessee held liable in damages for failure to comply therewith if compliance is prevented by, or if such failure is the result of any such law, order, rule or regulation or any event beyond the control of the Lessee. If from such cause Lessee is prevented from conducting drilling or reworking operations on the leased premises or producing oil or gas from the leased premises or lands pooled therewith, the time while the Lessee is so prevented shall not be counted against Lessee and this lease shall be extended for a period of time equal to that during which the Lessee is so prevented.

Hennessey Decl. (Dkt. No. 33–4) Exh. A at ¶ 13. Defendants argue that the force majeure event—the *de facto* moratorium— occurred on July 23, 2008 with the issuance of the governor's memorandum. *See* Defs' Amended Answer (Dkt. No. 29) Counterclaim ¶ 25. At that time, all of the leases were still in their primary terms. In fact, even after that event defendants apparently made timely advance payments of the delay rentals for the year 2009.[11]

Assuming Governor Paterson's July 2008 memorandum triggered the force majeure clause, that event occurred during the primary term of the leases. If the force majeure clause was triggered at the time, by the terms of the leases "the delay or interruption shall not be counted against [the] Lessee[s]." As a result, both logic and the unambiguous terms of the leases dictate the conclusion that the primary terms of the leases were then extended indefinitely, which required that defendants continue making timely delay rental payments indefinitely in order to

---

**10.** In advancing this position, the defendants seem to have retreated from their assertion in their counterclaim that as a result of the force majeure, the leases' *primary* term was extended. *See* Amended Answer (Dkt. No. 29) Counterclaim ¶¶ 31–32 and wherefore clause.

**11.** Defendants later sent plaintiffs a letter, on or about November 10, 2009, asserting that the *de facto* moratorium constituted a force majeure thereby extending the leases and suspending defendants' obligations thereunder indefinitely.

avoid termination. Defendants, however, failed to do so.

Perhaps are a result of this failure, defendants now argue in support of their motion that the force majeure advanced the leases into their secondary terms, but they fail to identify any contractual provision supporting this contention. Under the clear and unambiguous terms of the habendum clauses the only way for defendants' to have entered the secondary term of the leases would have been to "produce[ ] oil, gas or other substances ... in paying quantities...." Hennessey Decl. (Dkt. No. 33–4) Exh. A at ¶3; *see Sun Operating*, 984 S.W.2d at 286. This defendants also failed to do. The question thus remaining unanswered by the defendants in this case is, if the force majeure clause prevented any delay from being be counted against them, what contractual provision had the effect of ending of the primary terms of the leases, which still had more than a year left.[12]

Defendants also have failed to provide the court with any legal authority that supports their position. To the contrary, each of the cases defendants have cited in support of their contention that the force majeure propelled these leases into their secondary terms is readily distinguishable on its facts, and none stands for the broad proposition espoused by the defendants.[13] In *Sun Operating*, the oil and gas leases at issue, which were executed in 1947, included a habendum clause providing for a primary term of ten years and a force majeure clause.[14] *Sun Operat-*

---

**12.** Implicit in the defendants' argument, which was perhaps crafted to avoid this inevitable result, is the recognition that a force majeure occurring in the primary term would not have released the defendants from the duty to pay delay rentals if they sought to avoid termination of the leases.

**13.** In support of the their motion, defendants have submitted an affidavit given by Bruce M. Kramer, Dkt. No. 33–9, an attorney and law professor, and apparently an expert in the area of oil and gas law. Federal Rule of Evidence 702 governs the admissibility of expert testimony and affords the court discretion in determining whether expert testimony will be admitted. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994) (citation omitted). Generally, the use of expert testimony is not permitted if it will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Id.* (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991) and citing *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.)), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir.1988); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510–11 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). In this circuit, expert testimony that embraces a legal conclusion must be excluded. *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir.1992). I note that much of the Kramer affidavit is devoted to discussion of the law. In light of my determination, however, I find it unnecessary to determine whether that affidavit is admissible.

**14.** Specifically, the habendum clause in that case provided:

Subject to other provisions herein contained, this lease shall remain in force for a term of ten years from this date, called primary term, and as long thereafter as oil, gas or other mineral is produced from said land, or as long thereafter as Lessee shall conduct drilling or re-working operations thereon with no cessation of more that sixty consecutive days until production results, and if production results, so long as any such mineral is produced.

*Sun Operating*, 984 S.W.2d at 286. The force majeure clause stated:

When drilling or other operations are delayed or interrupted by lack of water, labor or materials, or by fire, storm, flood, war, rebellion, insurrection, riot, strike, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some order, requisition or necessity of the government, or as the result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

*ing,* 984 S.W.2d at 280. After execution of the leases, the lessee drilled wells and extracted gas from the land in paying quantities until decades later, April 11, 1983, at which time production was temporarily interrupted due to major repairs to a gas pipeline used to transport the gas produced and owned by the purchaser of the gas. *Id.* Production resumed by September 23, 1983. After a bifurcated trial, based upon the jury's finding that the lapse in production did not constitute a force majeure, the court declared the leases terminated. In reversing the trial court, the Texas Court of Appeals found that the court erred in instructing the jury that the defendant was required to exercise due diligence to avoid, remove, and overcome the effects of the force majeure, emphasizing that this "was not intended by the parties, given the language in their agreement." *Id.* at 284. In doing so, the court found only that the duration of the leases as stated in their habendum clauses may be affected by other provisions in the document, including a force majeure clause, emphasizing repeatedly, however, that the meaning and scope of such clause is "utterly dependent" upon the terms of the contract in which it appears. *See generally id.*

Defendants' reliance upon *Frost National Bank v. Matthews,* 713 S.W.2d 365 (Tex. Ct.App.1986) is equally misplaced and somewhat curious. There, the trial court, *inter alia,* granted summary judgment terminating the plaintiff's oil and gas lease, which had extended beyond its primary term. The gas producing wells on the defendant's property were shut-in pursuant to an order of the Texas Railroad Commission. During the period of the shut-in, the plaintiff made royalty payments—even though apparently not required to do so under the agreement—and

production of gas subsequently resumed. On appeal, the Texas Court of Appeals found that the order of the railroad commission fell within the scope of the force majeure clause of the lease, and that the lease should not have been terminated, noting also that the plaintiff made all of the required shut-in royalty payments. *Id.* at 368. Nothing in the court's decision in that case suggests that the force majeure clause in that instance triggered the secondary term. To the contrary, the facts show that the lease at issue had entered the secondary term even before the force majeure occurred. Similarly, the court's observation that the shut-in royalty payments did not appear necessary to avoid termination of the lease, which was extended under the force majeure clause, is inapposite to the issue here presented.

The third case relied upon by defendants, *Hunter Co. v. Vaughn,* 217 La. 459, 46 So.2d 735 (1950), similarly lends no support to their position. In *Hunter,* the plaintiff brought an action to cancel an oil, gas, and mineral lease based upon the defendants' alleged failure to drill a well on the leased premises within the primary term. The defendants asserted that they were prevented from drilling upon or producing from the property by a force majeure. The plaintiff appealed after a trial ended in defendants' favor. The appellate court found that the force majeure clause plainly covered the order issued by the commissioner of conservation, which prevented the defendants from drilling or producing. Significantly, the court in *Hunter* described the relevant provisions at issue as follows:

if [the] lessee is prevented from drilling or producing any well by reason of *force majeure,* lessee would be relieved of all obligations to drill on the leased premis-

*Id.* at 283.

es and the lease would not be subject to cancellation in such event. Paragraph 12(c) also provide[d] that if after the expiration of the primary term and while the lease is in force, lessee could not maintain the same in effect because prevented by force majeure, then the lease would nevertheless continue but lessee should pay to the owners, or to the credit of the owners in the depository bank, as royalty an amount equal to $1.00 per year for each acre retained thereunder during the period the lease was so continued in effect after the primary term.

*Id.* at 736. In other words, in contrast to the force majeure clause in the instant action, the specific force majeure provision at issue in *Hunter* expressly contemplated that the lease would continue beyond the primary term in the event of a force majeure.

In sum, defendants have cited no authority or contractual provision supporting their constrained construction of the terms of the leases in question. In view of the foregoing, the court rejects defendants' contention that the force majeure, which occurred during the leases' primary terms, catapulted the parties to those contracts into the secondary term.[15]

### 2. *Notice of Default*

■ Alternatively, relying on paragraph 14 of the leases, the defendants urge the court to deny plaintiffs' motion on the ground that plaintiffs did not provide notice of default. At first blush, this position is facially appealing. Paragraph 14 of the leases states that "[n]o default shall be declared against the Lessee for failure to make payment or perform any conditions provided for herein unless the Lessee shall refuse or neglect to pay or perform the same for thirty (30) days after having received written notice from Lessor." Hennessey Decl. (Dkt. No. 31–4) Exh. A at ¶ 14. On its face, the language of this provision may appear ambiguous or contradictory in light of the terms of the delay rental clause stating that the lease will "become null and void and all rights hereunder shall cease and terminate" unless the lessee shall pay delay rentals. *See id.* at ¶ 6. When reading the agreements as whole in the context in which they were made and avoiding any interpretation that would render any individual clause superfluous, as the court must, *Law Debenture Trust*, 595 F.3d at 468, the two provisions can be reconciled.

The overarching principle guiding the court's interpretation of oil and gas leases is one that defendants do not dispute; in

15. It is also worth noting that some courts have distinguished between occurrences of limiting conditions in the primary term and those that happen in the secondary lease terms, reasoning that,

[o]ccurrences of limiting conditions in the secondary lease term are treated differently. The habendum clause enumerates the conditions of continuation of the lease from the primary fixed term into a secondary term of indefinite duration. It directs continuation of the lease so long as production is maintained for the mutual benefit of the lessee and lessor. No automatic termination of the lessee's estate can be tolerated at this stage in the life of the lease, because the lessee has proved a valuable asset and has established a right to develop that asset. The interest the lessee has, after drilling and proving hydrocarbons, can be likened to a vested estate, the loss of which can only be effected through an action for forfeiture. Consequently, at law, the lessee in the secondary term must be given a reasonable opportunity to develop the asset without unreasonable fear of forfeiture.

*Danne*, 883 P.2d at 214. That same concern does not exist here where defendants never conducted drilling operations on the property, and the leases therefore remained in the primary term.

general, "unless" leases terminate automatically. *Rice,* 766 P.2d at 185; *Phyfer,* 884 F.2d at 238; *Petroleum Engineers Producing Corp.,* 350 P.2d at 604; *Phillips,* 182 F.2d at 125. "Such [leases] do not obligate the lessee to either drill or pay delay rentals, but if he does neither, the lease terminates without any action being required by the lessor or the lessee. In other words, its termination is automatic and self-operating." *Valentine Oil,* 59 N.W.2d at 159. As a result, if by their very terms the leases in question terminate when the lessee fails to pay delay rentals, to require any further action on the part of the lessor would seemingly render the language in the "unless" clause, to the effect that the leases "become null and void and all rights hereunder shall cease and terminate", superfluous, and would likewise be inconsistent with the notion of automatic termination to the extent that it would allow the lessee an opportunity to cure the purported default.

On the other hand, the notice of default provision can be given full effect and interpreted consistently with the "unless" clause by limiting its application to the lessee's failure to perform other conditions set forth in the agreements, such as the duty to make royalty payments (¶ 4), gas storage payments (¶ 9), and shut-in royalty payments (¶ 11). Indeed, such a construction of the leases clearly would effectuate the apparent intent of the parties in entering into the leases, without doing violence to any other provision of the leases, or rendering any portion of the default provision meaningless. Pursuant to the "unless" clause, the defendants were not required, but had the option or privilege, to pay delay rentals, without any liability for

the failure to do so. *See Williams v. Ware,* 167 Okla. 626, 31 P.2d 567, 569 (1934). Simply stated, it was not intended that defendants would be contractually obligated to make delay rental payments, or that plaintiffs would be entitled to declare the agreement in default, or in breach, as a result of their failure to do so.[16]

■ In this context, applying the governing principles of contract interpretation, I have concluded that when read as a whole, the leases automatically terminated upon defendants' failure to make delay rental payments and did not require that plaintiffs give notice of default, a conclusion that appears to be consistent with the weight of authority on this issue. *See, e.g., Richfield Oil Corp. v. Bloomfield,* 103 Cal. App.2d 589, 229 P.2d 838 (1951) (finding that the "unless" lease retains its character even where the lease contains a provision requiring notice of default upon breach of any term); *accord Woodside v. Lee,* 81 N.W.2d 745 (N.D.1957); *Fremont Lumber Co. v. Starrell Petroleum Co.,* 228 Or. 180, 364 P.2d 773 (1981); *Clovis v. Carson Oil & Gas Co.,* 11 F.Supp. 797 (E.D.Mich.1935); *see also* Nancy Saint-Paul, SUMMERS OIL AND GAS § 20.3 (citing cases); *Waddle v. Lucky Strike Oil Co., Inc.,* 551 S.W.2d 323 (Tenn.1977) (refusing to apply a no termination or forfeiture clause for failure to pay to an "unless" clause in an oil and gas lease). This interpretation of the leases gives full effect to all of the provisions at issue, and it is consistent with the intent of the parties as well as the early expressed principle of law in New York that "[w]hile, ordinarily, forfeiture or abandonment is not looked upon with favor, that rule is not applicable to

---

**16.** It has been observed that,

[t]he lessee who has this benefit of automatic termination of the lease should have no standing to claim relief from the automatic

termination when he is responsible for a failure to make timely payment of a rental. *Rice,* 766 P.2d at 185 (quoting 3 Williams, OIL AND GAS LAW § 606.2, p. 160 (1986)).

. . . oil leases." *Conkling*, 127 A.D. 761, 112 N.Y.S. at 17.

## IV. *SUMMARY AND CONCLUSION*

The state's moratorium on horizontal high-volume hydro-fracking for recovery of gas from the Marcellus Shale formation, assuming that it qualifies as a force majeure, has the effect of extending the primary term of each of the plaintiff's leases. That event, however, does not effectuate a transition into the secondary term of the leases, since drilling has not yet occurred and yielded gas or oil in paying quantities on any of the lessors' properties, and there is no lease provision which suggests that the existence of a force majeure results in a shift into the secondary terms of the leases.

Turning to the second issue raised, I find that the existence of a force majeure and the corresponding extension of the primary terms of plaintiffs' leases does not have the effect of depriving the lessors of the right to receive delay rental payments to which they are entitled under the leases for so long as drilling is postponed. And, since defendants did not make the required delay payments in 2009, during the primary terms of the leases, the leases at that point became automatically null and void notwithstanding the notice and default provision of the leases, a provision that is inapplicable to the non-payment of delay rentals under the "unless" leases at issue.

Based upon the foregoing, it is therefore hereby

ORDERED that plaintiffs' summary judgment motion (Dkt. No. 31) is GRANT-ED, and defendants' cross-motion for summary judgment (Dkt. No. 33) is DENIED, and the clerk is directed to enter judgment in plaintiffs' favor declaring that by virtue of defendants' failure to make the required delay rental payments beginning in 2009 the leases between the parties have become null and void and are no longer in effect.

## Hydraulic Fracturing Background Information

Hydraulic fracturing (HF) is a well stimulation process used to maximize the extraction of underground resources; including oil, natural gas, geothermal energy, and even water. The oil and gas industry uses HF to enhance subsurface fracture systems to allow oil or natural gas to move more freely from the rock pores to production wells that bring the oil or gas to the surface.

The process of hydraulic fracturing begins with building the necessary site infrastructure including well construction. Production wells may be drilled in the vertical direction only or paired with horizontal or directional sections. Vertical well sections may be drilled hundreds to thousands of feet below the land surface and lateral sections may extend 1000 to 6000 feet away from the well.

Fluids, commonly made up of water and chemical additives, are pumped into a geologic formation at high pressure during

hydraulic fracturing. When the pressure exceeds the rock strength, the fluids open or enlarge fractures that can extend several hundred feet away from the well. After the fractures are created, a propping agent is pumped into the fractures to keep them from closing when the pumping pressure is released. After fracturing is completed, the internal pressure of the geologic formation cause the injected fracturing fluids to rise to the surface where it may be stored in tanks or pits prior to disposal or recycling. Recovered fracturing fluids are referred to as flowback. Disposal options for flowback include discharge into surface water or underground injection.

Surface water discharges of the flowback are regulated by the National Pollutant Discharge Elimination System (NPDES) program, which requires flowback to be treated prior to discharge into surface water or underground injection prior to discharge. Treatment is typically performed by wastewater treatment facilities. Underground injection of flowback is regulated by either EPA Underground Injection Control (UIC) program or a state with primary UIC enforcement authority. Injection of natural gas production wastes would be considered a Class II injection well.

**EPA Hydraulic Fracturing of Coalbed Methane Reservoirs Study (2004)**

Prior to 1997, EPA considered hydraulic fracturing to be a well stimulation technique associated with production and therefore not subject to UIC. The Legal Environmental Assistance Foundation (LEAF) challenged EPA's opinion on hydraulic fracturing regulation in 1994, and the 11th Circuit Court of Appeals ruled that hydraulic fracturing of coalbed methane wells was indeed subject to the SDWA and UIC regulations under Alabama's UIC program in 1997.

EPA began a study on hydraulic fracturing used in coalbed methane reservoirs in 1999 to evaluate the potential risks to USDWs. The study focused on coalbed methane reservoirs because they are typically closer to the surface and in greater proximity to USDWs compared to conventional gas reservoirs. EPA published the coalbed methane study, entitled Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs (EPA 816–R–04–003) in 2004. The published study received both internal and external peer review, and public comment on study design and incident information. EPA concluded that there was little to no risk of fracturing fluid contaminating underground sources of drinking water during hydraulic fracturing of coalbed methane production wells. EPA retained the right, however, to conduct additional studies in the future. As a precautionary measure, the Agency also entered into a Memorandum of Agreement in 2003 with companies that conduct hydraulic fracturing of CBM wells to eliminate use of diesel fuel in fracturing fluids.

- Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs Study (2004)

The Energy Policy Act passed by Congress in 2005 amended SDWA to exclude hydraulic fracturing fluids (except diesel fuel) related to energy production from regulation under the UIC program. States may choose to regulate hydraulic fracturing, however.

Enter search words

Home » Energy and Climate » Oil and Gas » Marcellus Shale

On The Page...

3rd Floor
Albany, NY 12233-6500

518-402-8056

email us

## Marcellus Shale

### Gas well drilling in the Marcellus Shale

The public comment period on the draft Supplemental Generic Environmental Impact Statement (draft SGEIS) for horizontal drilling and high-volume hydraulic fracturing to develop the Marcellus Shale closed on December 31, 2009 and the Department is currently evaluating the many comments received. An Executive Order concerning the draft SGEIS was issued on December 13, 2010.

What is the Marcellus Shale?

The Marcellus Shale is a black shale formation extending deep underground from Ohio and West Virginia northeast into Pennsylvania and southern New York. Although the Marcellus Shale is exposed at the ground surface in some locations in the northern Finger Lakes area, it is as deep as 7,000 feet or more below the ground surface along the Pennsylvania border in the Delaware River valley. Drilling activity is expected to focus on areas where the Marcellus shale is deeper than 2,000 feet.

The boundaries of the Marcellus Shale formation in NY. Click on the map for a larger image.

How much natural gas is in the Marcellus Shale?

Geologists estimate that the entire Marcellus Shale formation contains between 168 trillion to 516 trillion cubic feet of natural gas throughout its entire extent. It is not yet known how much gas will be commercially recoverable from the Marcellus in New York. To put this into context, New York State uses about 1.1 trillion cubic feet of natural gas a year.

Why all the interest in the Marcellus Shale now?

Although geologists have long known about the natural gas resources of the Marcellus Shale formation, the depth and tightness of the shale made gas exploration and extraction very difficult and expensive. Interest has increased significantly of late due to:

- recent enhancements to gas well development technology, specifically horizontal drilling and hydraulic fracturing,
- the proximity of high natural gas demand markets in New York, New Jersey and New England and
- the construction of the Millennium Pipeline through the Southern Tier.

Questions have been raised about possible environmental and community impacts. Most concerns are related to water use and management and the composition of the fluids used for fracturing the shale. These are discussed below.

Landowners have been approached by energy and land management companies about leasing their land. Although leasing is not regulated by the Department, information about leasing gas well rights is available on our website.

What are horizontal drilling and hydraulic fracturing?

Horizontal drilling and hydraulic fracturing are legal and common in New York. The majority of wells in the Marcellus Shale will be hydraulically fractured.

**Horizontal drilling** has been used in New York since the 1980s. A "horizontal well" is first drilled down vertically to a depth above the target gas-bearing rock formation. Special tools are then used to curve the well so that the hole is drilled horizontally within the gas-bearing rock for up to several thousand feet. Ten percent of DEC's 2007 well drilling permits were for directional and horizontal wells.

Marcellus Shale

A horizontal gas well. Image courtesy Brad Cole, Geology.com

Except for special tools used underground, horizontal drilling is performed using the same equipment and technology as vertical drilling, with the same protocols in place for aquifer protection, fluid containment and waste handling.

**Benefits of horizontal drilling:**

- Maximum contact with the gas-bearing rock formation, so that more gas can be produced from a single well.
- Multiple horizontal wells can be drilled laterally from the same surface location, so that less of the ground surface is disturbed com-

pared to using vertical wells to produce the same amount of gas.

**Hydraulic fracturing** consists of pumping a fluid and a propping material such as sand down the well under high pressure to create fractures in the gas-bearing rock. The propping material (usually referred to as a "proppant") holds the fractures open, allowing more gas to flow into the well than would naturally. No blast or explosion is created by the hydraulic fracturing process, which has been used in New York since at least the 1950s. Hydraulic fracturing technology is especially helpful for "tight" rocks like shale.

**Quantity of water needed for hydraulic fracturing** Hydraulic fracturing of the Marcellus Shale will require large volumes of water to fracture the rocks and produce the desired amount of gas. Each well may use more than one million gallons of water.

**The hydraulic fracturing fluid** typically contains compounds added to the water to make the hydraulic fracturing process more effective. These may include a friction reducer, a biocide to prevent the growth of bacteria that would damage the well piping or clog the fractures, a gel to carry the proppant into the fractures, and various other agents to make sure the proppant stays in the fractures and to prevent corrosion of the pipes in the well. The Department is assessing the chemical makeup of these additives and will ensure that all necessary safeguards and best practices are followed.

More information, including general information about fracturing fluid additives, is available in the report Hydraulic Fracturing Considerations for Natural Gas Wells in the Marcellus Shale released in September 2008 at the Ground Water Protection Council's Annual Forum.

Disposal of hydraulic fracturing fluid Fluid removed from the well is required by law to be handled, transported and disposed of properly.

Did New York recently approve a new type of drilling?

No. In July 2008 Governor David A. Paterson approved a bill that extends uniform gas well spacing rules and establishes boundary setbacks to protect the interests of adjacent property owners. This new law has been widely misreported as allowing a new type of drilling, or somehow making it easier to get the environmental permits necessary for drilling. In fact, the new law only addresses well spacing. It authorizes nothing new nor in any way does it reduce the environmental review needed before a drilling permit is issued.

**Protecting the Environment, Water Resources and Public Water Supplies**

**DEC's Regulatory Program and Permitting Process** New York State's well-established regulatory program oversees drilling. DEC's Mineral Resources staff-averaging 22 years of experience per person-conducts a rigorous permitting process which protects the environment and landowner before the permit is issued, during drilling, when the well is plugged and when the site is restored. This includes:

- Review of each drilling application for environmental compliance before any drilling, which involves:
- Screening of the proposed well location to identify any environmental sensitivities, and
- Review of the proposed well design is to ensure that it is protective. (See Related Links at right.) This ground water protection diagram (PDF, 204 KB) illustrates how the required well casing and cement protects fresh water aquifers;
- On-site inspection of actual drilling operations; and

- Enforcement of strict restoration rules when drilling is completed.

Municipal water wells are protected by the requirement for a full environmental assessment if a proposed oil or gas well is within 2,000 feet of the municipal well and a supplemental environmental impact statement if within 1,000 feet. All groundwater, including private wells, is protected by strict construction requirements for oil and gas wells.

As a result of New York's rigorous regulatory process, the types of problems reported to have occurred in states without such strong environmental laws and rigorous regulations haven't happened here. No known instances of groundwater contamination have occurred from previous horizontal drilling or hydraulic fracturing projects in New York State.

**The Environmental Impact Review Process**

An active natural gas well in Chemung County after the drilling and completion work is done and the site has been reclaimed

A Generic Environmental Impact Statement (GEIS) provides a comprehensive review of the potential environmental impacts of oil and gas drilling and production and how they are mitigated. The Department is preparing a supplemental GEIS to assess issues unique to horizontal drilling and high-volume hydraulic fracturing of the Marcellus and other low permeability reservoirs. Governor Paterson directed DEC to supplement the GEIS when he signed the spacing bill.

While the process of preparing the Supplemental GEIS is ongoing, any entity that applies for a drilling permit for horizontal drilling in the Marcellus Shale and opts to proceed with its permit application will be required to undertake an individual, site-specific environmental review. That review must take into account the same issues being considered in the Supplemental GEIS process and must be consistent with the requirements of the State Environmental Quality Review Act and the state Environmental Conservation Law.

Use our on-line data base to find information about existing wells and permit applications.

## The Final Scope

The final scope for the Supplemental GEIS was released on February 6, 2009.

## The Draft SGEIS

The Draft Supplemental GEIS was released on September 30, 2009 and the public comment period ended on December 31, 2009.

## Other Agencies with Jurisdiction

The Susquehanna River Basin Commission (SRBC) and the Delaware River Basin Commission (DRBC) regulate the rate and volume of water withdrawals within their respective basins. These regional water authorities must review and approve water used for hydraulic fracturing projects in the Marcellus Shale. DEC has representatives on both Commissions and also regularly communicates with the New York City Department of Environmental Protection regarding the city's upstate water reservoirs.

## Executive Order No. 41: Requiring Further Environmental Review

WHEREAS, the 2009 New York State Energy Plan supports the development of in-State energy resources, including natural gas, to achieve the Plan's multiple public policy objectives; and

WHEREAS, low-volume hydraulic fracturing, or conventional fracking, has been used successfully and safely in New York State for many years to extract natural gas consistent with the Generic Environmental Impact Statement (GEIS) for Oil, Gas and Solution Mining Regulatory Program promulgated by the New York State Department of Environmental Conservation (Department) in 1992; and

WHEREAS, new technologies have emerged, and are being deployed in other states, to extract natural gas more efficiently through a process known as high-volume hydraulic fracturing combined with horizontal drilling; and

WHEREAS, there is a need for further study of this new technology prior to deployment in New York State; and

WHEREAS, in 2008, I directed the Commissioner of Environmental Conservation to initiate a formal public process to update the 1992 GEIS to ensure that any new technologies deployed in New York State are first thoroughly analyzed and regulated to ensure that all environmental and public health impacts are mitigated or avoided; and

WHEREAS, the Department issued a draft scope for an updated GEIS on October 6, 2008, held public meetings in the Marcellus shale region, received more than 3,000 written comments, and issued a final scope for the Supplemental Generic Environmental Impact Statement (SGEIS) on February 6, 2009. The Department released the Draft SGEIS for public review and comment on September 30, 2009, held four public hearings in the region and New York City, and received more than 13,000 written comments during a public comment period that closed December 31, 2009; and

WHEREAS, tens of thousands of citizens, landowners, local governments, large and small businesses, nongovernmental organizations, and other stakeholders have expressed their heartfelt support for or opposition to the new technology, but most agree that an objective, science-based analysis is the best approach to setting new policy.

NOW, THEREFORE, I, David A. Paterson, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and laws of the State of New York, do hereby order as follows:

1. The Department shall complete its review of the public comments, make such revisions to the Draft SGEIS that are necessary to analyze comprehensively the environmental impacts associated with high-volume hydraulic fracturing combined with horizontal drilling, ensure that such impacts are appropriately avoided or mitigated consistent with the State Environmental Quality Review Act (SEQRA), other provisions of the Environmental Conservation Law and other laws, and ensures that adequate regulatory measures are identified to protect public health and the environment; and

2. On or about June 1, 2011, the Department shall publish a Revised Draft SGEIS, accept public comment on the revisions for a period of not less than thirty days, and may schedule public hearings on such revisions to be conducted in the Marcellus shale region and New York City; and

3. Recognizing that, pursuant to SEQRA, no permits may be issued prior to the completion of a Final SGEIS, the Department, subsequent to the conclusion of the public comment period, shall report to the Governor on the status of the Final SGEIS and the regulatory conditions that are necessary to include in oil and gas well permits to protect public health and the environment.

GIVEN under my hand and the Privy Seal of the State in the City of Albany this thirteenth day of December in the year two thousand ten.

BY THE GOVERNOR

Secretary to the Governor

**More about Marcellus Shale:**

Large Map of Marcellus Shale Formation—A map showing the extent of the Marcellus Shale formation in New York State and recently drilled wells which produced natural gas from this formation in 2007

Commissioner's Testimony at NYS Assembly Hearing on Oil and Gas Drilling for DSGEIS—Commissioners Testimony at NYS Assembly Hearing on Oil and Gas Drilling for the Draft SGEIS.

Commissioner's Testimony at NYS Assembly Hearing on Oil and Gas Drilling October 15, 2008—Commissioner Grannis assured full environmental review of proposals to use horizontal drilling and hydraulic fracturing to develop natural gas reserves in the Marcellus Shale and other shale formations.

Commissioner's Testimony at NYC Council Hearing on Natural Gas Drilling in the New York City Drinking Water Watershed—Commissioner Grannis assured full assessment of any future applications to drill for natural gas in the watershed.

Commissioner's Editorial on Marcellus Shale—An editorial from DEC Commissioner Pete Grannis concerning natural gas exploration and drilling in Marcellus Shale.

Effect of Federal Safe Drinking Water Act, Clean Water Act and Emergency Planning and Community Right–to–Know Act—Certain exemptions or exclusions in these federal laws do not hinder the Department from regulating any aspect of Marcellus Shale development or from requiring that information about the composition of hydraulic fracturing fluid be submitted to the Department.