[No. A077049. First Dist., Div. Three. June 5, 1998.]

SAN MATEO COMMUNITY COLLEGE DISTRICT, Plaintiff and Respondent, v.
HALF MOON BAY LIMITED PARTNERSHIP et al., Defendants and Appellants.

402

## COUNSEL

Liccardo, Rossi, Sturges & McNeil, Robert S. Sturges and Richard B. Gullen for Defendants and Appellants.

Bergman & Wedner and Gregory A. Wedner for Plaintiff and Respondent.

## OPINION

**PHELAN, P. J.**—This appeal arises out of a quiet title action brought by respondent San Mateo County Community College District (the District) against Half Moon Bay Limited Partnership, Universal Organic Resources, Inc., George R. Kucera, La Honda Fields Limited Partnership, and Fred Golisano (collectively, appellants), who claim rights under an oil and gas lease entered into by the District and one Ivan Vovjoda on July 21, 1982. Appellants are the successors in interest to Vovjoda and American International Resources, Inc., a company to which Vovjoda assigned the lease in early 1986. Appellants appeal from the judgment and decree quieting title entered in favor of the District after a bench trial in August 1996 at which the trial court, interpreting the lease, concluded that it had terminated in July 1987. Although our reasoning differs in some respects from the rationale set forth in the trial court's statement of decision, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Lease*

On July 21, 1982, the District leased 184 acres in San Mateo County to Ivan Vovjoda "for the production of oil, gas and other hydrocarbons." Paragraph 2 of the lease is the "habendum clause," i.e., the clause in a deed or lease setting forth the duration of the grantee's or lessee's interest in the premises. (Williams & Meyers, Manual of Oil and Gas Terms (8th ed. 1991) p. 554.) Originally, paragraph 2 provided that the lease term was five years, "commencing July 21, 1982 and ending July 21, 1987, unless further extended as hereinafter set forth." The only other portion of the lease that addressed extension of the lease term was paragraph 3, which provided that the term might be extended by the mutual consent of both parties if the lessee were not in default with respect to any of the terms, covenants and conditions in the lease.[1]

In 1986, paragraph 2 was amended by adding the following language, which was inserted after the existing wording: "except that lessee may continue its operation past the termination date as to each well producing or being drilled at the time and in respect to which lessee is not in default. Lessee's right to continued operation as to said well(s) shall continue so long

---

[1]Neither party contends that the term of the lease was extended by mutual consent.

as such well(s) shall produce oil in paying quantities." This amendment is what is referred to as a "thereafter clause," i.e., a clause that provides for the continued validity of the lessee's interest after the expiration of the primary term, here, the initial five years, so long as a specified state of affairs continues. (Williams & Meyers, Manual of Oil and Gas Terms, *supra,* p. 1270.)

Subsequent paragraphs set forth the lessee's exploration, drilling and producing obligations. For example, paragraph 9 requires the lessee to commence exploration work within 90 days after the lease is awarded and all permits are obtained, and to prosecute drilling operations with reasonable diligence until oil or gas is found in "paying quantities." Paragraph 8 defines "paying quantities" as "sufficient quantities each year as will return a profit to Lessee over and above his operating but not his drilling or equipping costs in producing the oil and gas." The lease requires payment of an annual lease price of $1,840, as well as payment of 17.25 percent royalties on the value of all oil produced and removed from the land, on the net proceeds from the sale of gas sold and used off the premises, and on the net proceeds of any casinghead gasoline[2] sold by the lessee. Paragraph 10 provides that, if oil or gas is not found in paying quantities in the first well, the lessee is required to begin drilling a second well within three months of completing or abandoning the first, and if oil or gas is not found in the second well, the lessee is required to continue drilling successive wells until oil or gas is found "in paying quantities." Paragraph 11 provides that, if oil or gas is found in paying quantities, the lessee is required to continue drilling additional wells, "subject to the provisions hereof and to the suspension privileges hereinafter set forth," until there are as many wells on the land "as shall equal the total acreage then held under [the] lease divided by twenty (20)," which in this case was nine wells. At that point, the lessee would hold the land free of further drilling obligations.

The "suspension privileges" referred to in paragraph 10 are set forth as follows in paragraph 20, the force majeure clause: "The obligations of Lessee hereunder shall be suspended while Lessee is prevented from complying therewith, in whole or in part, by strikes, lockouts, action of the elements, laws, rules and regulations of any federal, state, municipal or other governmental agency, acts or requests of any governmental officer or agent purporting to act under authority, exhaustion or unavailability or delays in deliver[y] of necessary materials and equipment, or other matters or conditions beyond the control of Lessee, whether or not similar to the matters or

---

[2]A form of liquid hydrocarbon separated at the well head—sometimes referred to as "natural gasoline." (Williams & Meyers, Manual of Oil and Gas Terms, *supra,* p. 159.)

conditions herein specifically enumerated. It is expressly understood and agreed, notwithstanding any other provision of this lease inconsistent herewith, that all of Lessee's operations under this lease, including (but without limiting the generality hereof) the drilling and spacing of wells and the manner and rate of producing oil and/or gas therefrom, shall be conducted in accordance with any applicable law, whether now or hereafter enacted, of the United States and/or of the state in which said land is situated, and/or of any county or municipality or other governmental authority, and in accordance with regulations prescribed and/or orders issued under such law, and in the absence of any such law, may be conducted in conformity with any recommendation or request made in writing or published by any governmental authority or agency having legal juris diction [*sic*], or in accordance with any plan or program of conservation or curtailment voluntarily followed by producers of crude oil in said state generally. Drilling and producing operations hereunder may also be suspended while the price offered generally to producers in the same vicinity for oil of the quality produced from said land is Twenty Dollars ($20) or less per barrel at the well, or when there is no available market for the same at the well."

### 2. *History of Operations*

In 1984, Vovjoda approached Fred Golisano, the president of Universal Loan Incorporated, to obtain financing to commence drilling. Golisano found a group of investors and formed Half Moon Bay Limited Partnership in order to fund the exploration, drilling and producing operations. The first well was drilled in 1984. According to Golisano, it produced in paying quantities, so it was decided to proceed with the second well. The second well was more promising than the first, but through Vovjoda's negligence it collapsed and had to be abandoned. There was never any production from the second well.

Because of the loss of the second well, the limited partnership and Golisano's company, Universal Loan Incorporated, sued American International Resources, Inc., the company to which Vovjoda had assigned the lease in 1986. The action resulted in a judgment in favor of the limited partnership, which levied on the American International Resources' interest in the lease and then acquired it at the sheriff's execution sale on August 13, 1987.

A document entitled "Production History," which was compiled by appellants' expert from information filed with the state division of oil and gas, shows that the first well produced 1,330 barrels of oil in 1984 and 174 barrels in 1986. This document also shows that gas, in an unspecified unit of

measurement,[3] was produced in 1984 and 1986, although Golisano testified at trial that until "recently" there was no market for gas. There was no production of any kind for the years 1985, 1987, or 1988. Golisano testified that before the sheriff's sale, the first well produced only small amounts of oil because gas pressure was impeding the flow of oil. When gas was vented and the pressure relieved, more oil flowed. Golisano claimed there was no way to produce oil without venting gas, but that venting gas was illegal. Public Resources Code section 3300 states that "unreasonable waste of natural gas" is "opposed to the public interest" and "unlawful," and that the "blowing, release, or escape of gas into the air shall be prima facie evidence of unreasonable waste." Neither appellants nor their predecessors were ever cited for venting gas while producing oil.[4]

At some point after the sheriff's sale in August 1987, appellants installed a different type of pump and were able to produce an unspecified amount of oil, although they also continued to vent gas in their efforts to obtain greater production. Starting in 1989, appellants began to explore the possibility of selling gas to Pacific Gas and Electric Company (PG&E). PG&E was willing to purchase the gas and worked with appellants to estimate costs and to develop alternative scenarios for connecting the well to PG&E gas distribution lines. The record contains no information concerning what efforts, if any, were made to sell gas to PG&E or other potential purchasers before July 21, 1987.

Appellants do not dispute that as of July 21, 1987, no oil or gas was actually being produced from the well, and no new well was being drilled. The District filed its quiet title action in March 1995, and after a bench trial in August 1996, a judgment and decree was entered in favor of the District on November 14, 1996. In its statement of decision, the trial court concluded the lease had expired in July 1987, and that appellants did not retain any interest in the sole existing well on the property. The court reasoned that, since no oil had been produced without illegally venting gas, there had been no production in paying quantities within the meaning of the lease, because the lease requires that all operations be conducted in accordance with applicable laws. The trial court also concluded that appellants had the burden of proving "all excuses for [their] failure to produce" but that they "failed to prove any." The judgment against appellants also awarded attorney fees and costs to the District.

---

[3] Gas production was probably measured in thousands of cubic feet, or MCF's.

[4] In October 1988 appellants were cited by the Bay Area Air Quality Management District for having oil in an open well cellar. Although appellants imply that this citation is somehow connected to their claim that it was impossible to produce oil without illegally venting gas, the citation appears to have no direct bearing on that issue.

## DISCUSSION

I. *The Force Majeure Clause in the Subject Lease Applies Only to the Lease Covenants, Not to the Conditions Set Forth in the Habendum Clause.*

This appeal requires us to interpret the terms of an oil and gas lease, in particular, the habendum clause and the force majeure clause. As appellant concedes, the language of this lease is not ambiguous. ■ Where the language of an agreement is clear and not absurd, it will be followed. (Civ. Code, § 1638.) Moreover, where, as here, the meaning of the agreement does not turn on the credibility of extrinsic evidence, interpretation is a question of law, and the appellate court will make an independent determination of the agreement's meaning. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Montana-Fresno Oil Co.* v. *Powell* (1963) 219 Cal.App.2d 653, 666 [33 Cal.Rptr. 401]; *Transport Oil Co.* v. *Exeter Oil Co.* (1948) 84 Cal.App.2d 616, 620 [191 P.2d 129].) When an appellate court reviews a trial court's construction of an oil and gas lease as a matter of law, it construes the lease liberally in favor of the lessor and strictly against the lessee. (*Lough* v. *Coal Oil, Inc.* (1990) 217 Cal.App.3d 1518, 1525 [266 Cal.Rptr. 611].)

■ An oil and gas lease is both a conveyance and a contract. (*Montana-Fresno Oil Co.* v. *Powell, supra,* 219 Cal.App.2d at p. 659.) The conveyancing elements are the granting and habendum clauses, and the contractual elements include the provisions that pertain to the lessee's obligations with respect to exploring, drilling, and producing operations. (See *ibid.*) ■ As originally drafted, the lease here was for a definite term of five years, ending on July 21, 1987. The 1986 amendment, which added the "thereafter clause," converted the lessee's interest to a determinable fee which would expire on July 21, 1987, except as to any well "producing or being drilled *at the time* . . . ." (Italics added.) ■ A "thereafter clause" prescribes the condition of fact that must exist in order for the lease term to be extended. (*Dabney* v. *Edwards* (1935) 5 Cal.2d 1, 14 [53 P.2d 962, 103 A.L.R. 822]; *Macco Construction Co.* v. *Fickert* (1946) 76 Cal.App.2d 295, 304 [172 P.2d 951].) "Thereafter clauses" are not uniformly worded, so the conditions that will permit the lessee to continue operations after the primary term vary from lease to lease. (See *Dabney* v. *Edwards, supra,* 5 Cal.2d at p. 13.) ■ Here, the existence of a well producing or being drilled on July 21, 1987—"at the time" the primary term ends—is a condition precedent to the extension of the lease term. With respect to any such well producing or being drilled as of July 21, 1987, the lessee could

continue operations after the primary term as long as the well continued to "produce oil in paying quantities." In the event that no well is producing or being drilled at the end of the five-year term, the lease terminates. Termination in this fashion does not constitute a forfeiture for breach of a lease covenant, but is simply a conditional limitation on the lease term. (*Montana-Fresno Oil Co.* v. *Powell; supra,* 219 Cal.App.2d at pp. 659-662; *Macco Construction Co.* v. *Fickert, supra,* 76 Cal.App.2d at p. 304.)

 Appellants do not contend that a well was being drilled as of July 21, 1987, or that the only existing well on the property was actually producing either oil or gas on that date. Instead, they suggest that discovery of oil and gas, and production at some point during the primary term, satisfy the conditions required to extend the lease. But as appellants themselves state, "There is . . . a difference between the finding of oil or gas and producing it." The "thereafter clause" in this lease does not extend the term if oil or gas have merely been *found* on the property during the primary term, or if there is simply what is called a "producible well" as of July 21, 1987, i.e., a well merely *capable* of producing oil or gas but not actually doing so. (See Williams & Meyers, Manual of Oil and Gas Terms, *supra,* p. 957.) Rather, the "thereafter clause" here requires the existence of a well that is actually producing, and a "producing well" is not one in which oil or gas has simply been discovered but from which no oil or gas is actually being produced. (See *Montana-Fresno Oil Co.* v. *Powell, supra,* 219 Cal.App.2d at pp. 667-668; accord, *Holchak* v. *Clark* (Tex. Civ. App. 1955) 284 S.W.2d 399, 400-401.)

While appellants do not claim there was any oil or gas actually being produced as of July 21, 1987, they contend that the failure of the condition precedent required to extend the lease was excused by operation of three provisions of the force majeure clause set forth in paragraph 20: (1) the provision suspending the lessee's "obligations" while the lessee "is prevented from complying therewith . . . by . . . laws, rules and regulations of any federal, state, municipal or other governmental agency"; (2) the provision that the drilling and producing operations may be suspended while the price of oil is below $20 per barrel; and, (3) the related provision that the drilling and producing operations may be suspended while there is no available market for "the same"—i.e., for *oil*—at the well. The gist of appellants' argument is that the conditions required to extend the lease under the "thereafter clause" would have been met on July 21, 1987, but for (1) regulations prohibiting the venting of gas, (2) the price of oil, and (3) the lack of a market. Thus, the threshold question here is whether the force majeure clause in this particular lease, under which the lessee's "obligations" may be suspended, applies to the *conditions* set forth in the habendum clause, or applies only to the lease *covenants.*

Appellants simply assume that the force majeure clause applies to the conditions in the habendum clause, even though the force majeure clause itself expressly suspends only the lessee's "obligations," a term normally used to refer to lease covenants. (See, e.g., *Kirker* v. *Shell Oil Co.* (1951) 104 Cal.App.2d 497, 504 [231 P.2d 905].) ■ "Lease provisions are either covenants or conditions. A covenant is a promise to do or refrain from doing a specific act. A condition is a qualification to the parties' obligations; if it occurs, the interest is terminated or enlarged." (6 Miller & Starr, Cal. Real Estate Law (2d ed. 1989) Landlord and Tenant, § 18:40, p. 84, fn. omitted; *Knight* v. *Black* (1912) 19 Cal.App. 518, 522 [126 P. 512].) A condition is created by the mutual assent of the parties and is binding on both, while a covenant is binding on the covenantor only. (*Knight* v. *Black, supra,* at p. 522.) ■ The commentators relied upon by appellants themselves point out that, "*A force majeure* clause may be applicable only to particular covenants of the lease, or may be applicable to covenants generally, to conditions as well as to covenants, or to limitations as well as conditions and covenants." (Williams & Meyers, Oil and Gas Law (1988 abridged ed.) § 683.2(5), p. 423.) As noted nearly 40 years ago in Sheinberg, *The Force Majeure Clause: A Tool For Mitigating the Effect of the Determinable Fee Concept of the Modern Oil and Gas Lease* (1959) 6 UCLA L.Rev. 269, if the lessee wishes to "preclude a possible termination of [his] valuable interest for unavoidable failure to strictly comply with the *conditions precedent* to continuation of his estate," then care in drafting should be taken "to ensure that the language of the force majeure clause covers contingencies which affect *conditions,* as well as covenants, implied and expressed. Careless drafting . . . might nullify the effectiveness of the clause as a device for preventing the expiration of the lease for failure to comply with the *conditions* or limitation of the typical habendum clause . . . ." (*Id.* at p. 278, italics in original.) The author observes, for example, that a clause which excuses "performance of any of the express or implied covenants of this lease" in the event of "strikes, embargoes, requirements of the civil or military authorities of the Government of the United States, State or any subdivision thereof, Acts of God, war or public enemy" would be of "no use" in preventing termination of the lease for failure of a condition precedent in the habendum clause since only "express or implied covenants" are covered. (*Id.* at pp. 278, 297.) In Hall, *The Application of the Determinable Fee Theory in Construing the Mississippi Mineral Lease* (1948) 19 Miss. L.J. 291, 300, the author reaches a similar conclusion regarding the effect of a force majeure clause that pertains only to covenants: "It is doubtful if this clause [covering covenants] will accomplish everything the lessee probably intended for it to do. There is a well settled distinction between a covenant and a special limitation, and in the ordinary situation the former term does

not embrace the latter. Thus, since the habendum clause is a clause of special limitation, the provision relating to excusing the lessee for failure to perform a covenant would have no effect on the habendum clause." (Fn. omitted.) Moreover, "it is a long-established rule of law that any language in a deed, subsequent to the granting and habendum clauses, may not modify, cut down or control those clauses, unless such clauses [granting and habendum] incorporate the additional language by express reference." (*Kirker* v. *Shell Oil Co.*, *supra*, 104 Cal.App.2d at p. 503.) ▇▇▇▇ Here, the only reference in the habendum clause to any other provision in the lease is the statement that the term may be "extended as hereinafter set forth," which we interpret as referring to the paragraph that immediately follows, which provides that the lease "may be extended upon mutual consent of both parties."

Disregarding the principle set forth in *Kirker*, appellants request that we adopt the following language from *Macco Construction Co.* v. *Fickert, supra,* 76 Cal.App.2d at page 304 as the rule in this case: "Production is specified as a condition precedent to an extension, and unless it be established that the well was producing on the expiration date *or that a condition excusing such production obtained,* the lessee fails to present a valid claim to possessory and exploratory or operative rights." (Italics added.) The italicized phrase, which is of most interest to appellants, is dictum because the opinion contains no information from which the reader can infer one way or the other whether the habendum clause incorporated a force majeure clause by reference or expressly provided that failure of the condition precedent could be excused under certain circumstances. To the extent that this sentence suggests that failure of the condition precedent can be excused without an express provision in the habendum clause, it is inconsistent with rule stated in *Kirker* v. *Shell Oil Co., supra,* 104 Cal.App.2d at page 503, and we decline to adopt it.

Here, the habendum clause does not incorporate the force majeure clause by reference and does not include any provision that circumstances set forth in the force majeure clause may excuse failure of the condition precedent. It is therefore distinguishable from the habendum clause in *Kirker* for example, which provided for a primary term of 20 years and an extension " '. . . for so long thereafter as Lessee shall conduct drilling . . . or producing operations on the leased land, *or be excused therefrom, as hereinafter provided;* . . .' " (104 Cal.App.2d at p. 498, italics added.) It is also distinguishable from the habendum clause in *Southern Pacific Land Co.* v. *Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807 [233 Cal.Rptr. 794], which expressly provided that the term of the lease set forth in the habendum clause could be modified and enlarged by other provisions in the lease. (*Id.*

at pp. 818-819.) In that case, which involved a lease with no drilling or production requirements during the primary term, the court held that a "dry hole" clause[5] extended the primary term because it was the only portion of the lease that dealt with that issue, and was therefore the only reason for including the modification and enlargement proviso in the habendum clause. (*Id.* at p. 820.) Thus, unless the "dry hole" clause were interpreted as extending the primary term, it would serve no function, but would be mere surplusage. (*Id.* at p. 821.)

Appellants suggest that the force majeure clause here is similarly "meaningless" unless it is interpreted as extending the lease term in the event that the lessee's obligations are suspended. The trial court concluded that this argument was "simply untenable," and we agree. While an oil and gas lease may include a provision that if performance is temporarily suspended or excused, the time period of the suspension will not count against the primary lease term, the lease here contains no such provision.[6] That does not make the force majeure clause here "meaningless," however, since it protects the lessee against forfeiture on account of the lessee's failure to perform lease covenants under certain circumstances. For example, if the lessee were prevented by a strike in the third year of the lease from meeting the drilling schedule set forth in paragraph 10, he would not forfeit the remaining portion of the five-year term.

Because the habendum clause here does not contain either a provision excusing failure of a condition required to extend the lease term or a provision incorporating the force majeure clause by reference, and because the force majeure clause refers only to suspending the lessee's "obligations," i.e., covenants, we conclude that the force majeure clause does not modify or enlarge the lease term, and that the lease terminated on July 21, 1987, because there was no well being drilled and no production occurring as of that date.

---

[5]A "dry hole" clause is a provision specifying the means by which a lessee may keep a lease alive after drilling a nonproducing well. (Williams & Meyers, Manual of Oil and Gas Terms, *supra*, at pp. 366-367.)

[6]Sample clause "C" in Sheinberg, *The Force Majeure Clause: A Tool For Mitigating the Effect of the Determinable Fee Concept of the Modern Oil and Gas Lease, supra,* 6 UCLA L.Rev. at page 296 contains such a provision. The clause provides in pertinent part that, ". . . this lease shall be extended and continued in force while and so long as lessee is prevented by Force Majeure from conducting drilling or reworking operations on or producing oil or gas or other mineral from the leased premises and for six months thereafter; and the time while lessee is so prevented, plus six months, shall not be counted against lessee . . . ."

II. *Even Assuming, Arguendo, That the Force Majeure Clause Pertains to the Conditions Set Forth in the Habendum Clause, Appellants Failed to Prove Any of Their Defenses.*

■ The burden of proving impossibility or excuse is on the party asserting the defense. (See *Butler* v. *Nepple* (1960) 54 Cal.2d 589, 598-599 [6 Cal.Rptr. 767, 354 P.2d 239]) ■ Thus, even if we had concluded that the force majeure clause applied not only to the lease covenants but also to the conditions precedent in the habendum clause, we would nevertheless affirm the trial court's determination that the lease terminated on July 21, 1987, because appellants failed to prove that any of the circumstances set forth in paragraph 20 prevented their predecessors from operating a producing well as of the end of the primary term.

We first consider appellants' argument that the purported lack of a market for gas excused performance of the drilling and producing operations. Paragraph 20 provides that drilling and producing operations may be suspended while the price of oil is $20 per barrel or less, or when there is no available market for "the same"—i.e., for *oil*—at the well. Clearly, whether or not there is a market for *gas* at the well is entirely irrelevant to application of the force majeure clause here, and is not grounds for suspending operations under the terms of this lease.

Second, the evidence introduced by appellants at trial in an effort to show that reduced oil prices suspended the lessee's producing and drilling obligations fell short of what was required to meet their burden of proof. Appellants provided a document summarizing oil prices from December 18, 1989, through April 21, 1995, but prices during that period cannot be used to justify the suspension of drilling or producing operations before July 21, 1987. Appellants presented no evidence establishing the price of oil during the period leading up to and including that date, and none establishing that any of the prices testified to by Golisano or their expert, a petroleum geologist, were the prices "offered generally to producers in the same vicinity" for oil "of the quality" produced by the well on the property, as specified in the force majeure clause. Golisano merely testified that oil was priced at $32 per barrel when the limited partnership was formed, and that from the time the well was first drilled until December 1989 the price went as high as $30 per barrel, but at some unspecified time after the well was drilled, oil prices "went to the bottom . . . 10, 11, $12 a barrel" and stayed at that level until the Gulf War. Appellants' expert, a petroleum geologist, provided equally vague testimony regarding oil prices. Thus, appellants' evidence is insufficient to show that oil prices permitted the lessee to

suspend drilling and producing operations at or near the end of the primary term.

Finally, appellants contend that air quality regulations prohibited the venting of gas from the well, that oil could not be produced without venting gas, and that oil could therefore not be produced without violating the law. As the trial court correctly noted in its statement of decision, appellants were not actually prevented by law from producing oil, and they failed to present any competent evidence to prove their contention that it was impossible to produce oil without venting gas.

The trial court based its judgment in favor of the District on the conclusion that the lease terminated in July 1987 because oil was never produced in paying quantities, because it was never *legally* produced. Appellants argue that in reaching this conclusion, the court improperly implied a legality condition into the lease. This is incorrect. The trial court implied nothing. Paragraph 20 expressly requires that all of the lessee's operations, which obviously include the production of oil, must be conducted in accordance with applicable law. Appellants' evidence at trial demonstrated that oil had not, in fact, been produced legally, but not that it was impossible to do so. In fact, Golisano admitted that equipment existed which would allow production without venting gas into the atmosphere, and neither he nor any other witness provided competent testimony that such equipment could not have been used at the subject well. Instead, he testified that although appellants had sufficient money to purchase compressors for capturing gas vapor, they did not believe it was "prudent" to do so. Thus, appellants' rationale for ceasing operations appears to have come down to money, but they provided no real evidence, either in the form of expert testimony or otherwise, showing that production would have entailed excessive or unreasonable difficulty or expense. "Even in the case of a *force majeure* provision in a contract, mere increase in expense does not excuse the performance unless there exists 'extreme and unreasonable difficulty, expense, injury, or loss involved.'" (*Butler* v. *Nepple, supra*, 54 Cal.2d at p. 599.) Given the insufficiency of appellants' evidence, the trial judge could reasonably conclude appellants had not carried their burden of proof with respect to their "illegality" defense, or the other defenses based on paragraph 20 of the lease.

III. *The Award of Attorney Fees and Cost Against Kucera and La Honda Is Affirmed.*

Code of Civil Procedure section 761.030, subdivision (b) provides that if the defendant in an action to quiet title "disclaims in the answer any

claim, or suffers judgment to be taken without answer, the plaintiff shall not recover costs." Appellants contend that under section 761.030, subdivision (b), the trial court should not have awarded attorney fees and costs against appellants George R. Kucera and La Honda Fields Limited Partnership (La Honda) because they disclaimed any interest in the lease.

We first consider the judgment for attorney fees and whether it is barred by the disclaimer provision of Code of Civil Procedure section 761.030, subdivision (b). In *Stubblefield* v. *Fickle* (1954) 123 Cal.App.2d 325, 326-327 [266 P.2d 808], defendants were lessees under an oil and gas lease which included a provision that they would pay the lessors' attorney fees if the lessors brought an action to quiet title against the cloud of the lease. (*Id.* at p. 326.) Approximately two years after entering the lease, the lessors served a notice of default, which the lessees ignored; the lessors then filed a quiet title action. (*Ibid.*) The lessees did not answer, but disclaimed any interest in the land covered by the lease. (*Ibid.*) Relying on former section 739 of the Code of Civil Procedure, which is the predecessor to section 761.030, subdivision (b), the trial court refused to award attorney fees because the defendants had filed a disclaimer. The appellate court reversed, holding that attorney fees are not part of the costs referred to in former section 739 of the Code of Civil Procedure, and that the disclaimer filed after the action was brought did not relieve the lessees of their contractual obligation to pay the lessors' attorney fees. (123 Cal.App.2d at p. 327.)

The same rationale applies with respect to the judgment for attorney fees against Kucera and La Honda. ▇▇▇ "[A] statutory provision which precludes an award of costs does not preclude a successful litigant from recovering contractual attorney fees." (*Ripley* v. *Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1626 [28 Cal.Rptr.2d 878].) ▇▇▇ Here, lease paragraph 35 provides that "the Lessee shall be responsible for and hereby agrees to pay all . . . costs and expenses incurred by Lessor, including a reasonable sum for attorneys fees" in the event the lessor incurs such costs and fees in an action to enforce any provision of the lease against the lessee. We read the term "Lessee" in paragraph 35 broadly enough to encompass Kucera and La Honda, who described themselves in the answer to the District's complaint as "trustees for and agents of" Half Moon Bay Limited Partnership and its general partners, who claimed to be the "beneficial owners of the lessee's interest in the lease." Thus, Kucera and La Honda's attempt to disclaim an interest in the lease does not bar the judgment for attorney fees, which we affirm.

We also find Kucera and La Honda's less-than-unequivocal disclaimer ineffective to shield them against the judgment for costs. Although Kucera

and La Honda alleged in their answer that they held no "beneficial interest" in the lease themselves, and that they had "assigned their legal title as trustees to the Half Moon Bay defendants," they, like the other appellants, denied the District's right to quiet title, and prayed for judgment that "the Half Moon Bay defendants" were the owners of all the lessee's rights under the lease and that they, Kucera and La Honda, were trustees holding any interest in the lease for the use and benefit of "the Half Moon Bay defendants." In *McMorris* v. *Pagano* (1944) 63 Cal.App.2d 446 [146 P.2d 944], a judgment for costs was affirmed against defendants in a quiet title action who filed an answer which disclaimed any interest in the property but which also denied all the allegations of the complaint, including the plaintiff's allegation of possession. The court held that if the defendants wished to avail themselves of the provision in Code of Civil Procedure former section 739 relating to disclaimers in order to save themselves costs, they should not have raised the issue regarding the plaintiff's possession and other material issues alleged and "put [plaintiff] to his proof." (63 Cal.App.2d at p. 452; see also *Brooks* v. *Calderwood* (1868) 34 Cal. 563.) Here, all the appellants, including Kucera and La Honda, put the District to its proof, since they alleged in their answer that "the Half Moon Bay defendants" were and remained the sole owners of the interests and rights created by the lease and that the District was not entitled to the relief it sought in the quiet title action. Had Kucera and La Honda wished to rely on the disclaimer provisions of Code of Civil Procedure, section 761.030, subdivision (b) they could have chosen either not to answer or to disclaim any interest in the lease without adding allegations in aid of the other parties who were expressly claiming such an interest. Instead, they chose to throw in their weight in opposition to the District's claim. The judgment for costs against Kucera and La Honda is therefore also affirmed.

## DISPOSITION

We affirm the trial court's judgment in favor of the San Mateo County Community College District, including the award of attorney fees and costs against Kucera and La Honda Fields Limited Partnership. Respondent is awarded its costs on appeal.

Corrigan, J., and Walker, J., concurred.