12-4897-cv
*Beardslee v. Inflection Energy, LLC*

# United States Court of Appeals

FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: August 22, 2013      Decided: July 31, 2014)

Docket No. 12-4897-cv

_____

WALTER R. BEARDSLEE, INDIVIDUALLY AND AS CO-TRUSTEE OF THE DRUSILLA W.
BEARDSLEE FAMILY TRUST, ANDREA R. MENZIES, AS CO-TRUSTEE OF THE DRUSILLA
W. BEARDSLEE FAMILY TRUST, JOHN A. BEARDSLEE, AS CO-TRUSTEE OF THE
DRUSILLA W. BEARDSLEE FAMILY TRUST, PHYLLIS L. BENSON, ELIZABETH A.
BEARDSLEE, LYNDA B. COCCIA, NATHAN J. DONNELLY, CAROLYN B. DONNELLY,
KEVIN P. DONNELLY, ROSE ANN DONNELLY, MARIE S. DONNELLY, WILLIAM J.
HANER, JOSEPH HANER, JAMES HANER, MARGARET LAWTON, GLEN MARTIN, LYNN
M. MARTIN, JOSEPH E. MCTAMNEY, B. LOUISE MCTAMNEY, BONNIE D. MEAD, R.
DEWEY MEAD, WAYNE R. MIDDENDORF, CYNTHIA L. MIDDENDORF, FLOYD E.
MOSHER, JR., LESA D. MOSHER, AKA LESA HUNTINGTON, MOUNTAIN PARADISE
CLUB NY 31 LLC, JAMES W. REYNOLDS, AS TRUSTEE OF THE JAMES W. REYNOLDS
TRUST, MARY A. PFEIL-ELLIS, KERRY K. ELLIS, PAUL R. SALAMIDA, PAULINE M.
SALAMIDA, GARY D. SHAY, BONITA K. SHAY, BRAD A. VARGASON,

*Plaintiffs-Counter-Defendants-Appellees*,

–v.–

INFLECTION ENERGY, LLC, VICTORY ENERGY CORPORATION, MEGAENERGY, INC.,

*Defendants-Counter-Claimants-Appellants*.

––––––––––––––––––

Before:
        WINTER, WESLEY, AND CARNEY, *Circuit Judges*.

––––––––––––––––––

Appeal from a decision of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*) granting the motion of Appellees Walter R. Beardslee, *et al.*, landowners and lessors, for summary judgment, and denying the motion for summary judgment of their lessees, Appellants Inflection Energy, LLC, Victory Energy Corporation, and Megaenergy, Inc. The District Court concluded that the parties' oil and gas leases had expired by their terms, reasoning that New York State's regulatory actions did not trigger application of the leases' *"force majeure"* clauses. Because this case raises significant and novel questions of New York oil and gas law, we certify two questions to the New York Court of Appeals for resolution in the first instance.

QUESTIONS CERTIFIED.

––––––––––––––––––

THOMAS S. WEST, The West Firm, PLLC, Albany, N.Y., *for Defendants-Counter-Claimants-Appellants Inflection Energy, LLC, et al.*

ROBERT R. JONES (Peter H. Bouman, *on the brief*), Coughlin & Gerhart, LLP, Binghamton, N.Y., *for Plaintiffs-Counter-Defendants-Appellees Walter R. Beardslee, et al.*

WALTER P. LOUGHLIN (Walter A. Bunt, Jr., Bryan D. Rohm, *on the brief*), K&L Gates LLP, New York, N.Y., *for* Amicus Curiae *Marcellus Shale Coalition.*

SUSAN L. CARNEY, *Circuit Judge*:

Inflection Energy, LLC ("Inflection"), Victory Energy Corporation

("Victory"), and Megaenergy, Inc. ("Mega") (collectively, the "Energy

Companies") appeal from the District Court's order granting summary judgment

to Walter and Elizabeth Beardslee and over thirty other landowners (collectively,

the "Landowners"), and denying summary judgment to the Energy Companies.

Starting in 2001, the Landowners entered into certain oil and gas leases

(the "Leases") with the Energy Companies, granting the Energy Companies

specified rights to extract oil and gas underlying the Landowners' real property

(the "Properties") in the Southern Tier of New York State. Each of the Leases has

an initial primary term of five years and provided for a secondary term that, once

triggered, would last "as long thereafter as the said land is operated by Lessee in

the production of oil or gas." App'x 32 ¶ 1.

The Energy Companies failed to produce oil and gas from the Properties

within the Leases' primary terms, and thereafter, in 2012, the Landowners filed

this action seeking a declaration that the Leases had expired. The Energy

Companies counterclaimed for a declaration to the contrary. They argued that

each Lease was extended by operation of a purported *force majeure* clause,

triggered (they argued) by New York State's de facto moratorium (the

3

"Moratorium") on the use of horizontal drilling and high-volume hydraulic fracturing ("HVHF").

The District Court ruled in favor of the Landowners and declared that the Leases had expired. *Beardslee v. Inflection Energy, LLC*, 904 F. Supp. 2d 213 (N.D.N.Y. 2012) (Hurd, *Judge*).[1]  The Energy Companies timely appealed.

For the reasons discussed below, we conclude that this case turns on significant and novel issues of New York law concerning the interpretation of oil and gas leases, a legal field that is both relatively undeveloped in the State and of potentially great commercial and environmental significance to State residents and businesses.  Accordingly, we certify two pivotal questions of New York law to the New York Court of Appeals, requesting its consideration of these questions in the first instance.

**BACKGROUND**

1. **The Oil and Gas Leases**

This action concerns rights of access to the important natural resources underlying land in Tioga County, New York.[2]  Located in the Southern Tier of

_____

[1] The District Court reached the same conclusion with regard to other New York State oil and gas leaseholds in a case presenting closely parallel facts. *Aukema v. Chesapeake Appalachia, LLC*, 904 F. Supp. 2d 199 (N.D.N.Y. 2012) (Hurd, *Judge*.).

[2] The facts are drawn in part from the District Court opinion, with other sources and

New York and bordering Pennsylvania, Tioga County sits on the Marcellus

Shale, "a black shale formation extending deep underground from Ohio and

West Virginia northeast into Pennsylvania and southern New York."[3] The

formation as a whole is estimated to contain up to 489 trillion cubic feet of

natural gas — an energy resource of enormous potential.[4] The formation has

been characterized in recent years as offering "one of the most significant

opportunities for domestic natural gas development in many years."[5]

Beginning in 2001, the Landowners separately entered into the oil and gas

Leases with Victory, granting Victory certain rights to extract oil and gas

resources underlying the Properties.[6] For a nominal annual fee or, if drilling

commenced, the right to receive a royalty on gross proceeds related to oil and

gas extracted and sold, Victory acquired "the rights of drilling, producing, and

---

contested issues noted as necessary.

[3] *Marcellus Shale: The Environmental Review Process for Natural Gas Exploration in the Marcellus Shale*, N.Y. STATE DEP'T OF ENVTL. CONSERV., http://www.dec.ny.gov/energy/46288.html (last visited July 29, 2014) (the "2012 DEC Report").

[4] *Id*. According to estimates published in the 2012 DEC Report, New York State's natural gas usage rate in 2012 (for comparison) was approximately 1.1 trillion cubic feet. *Id*.

[5] George A. Bibikos & Jeffrey C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States*, 4 TEX. J. OIL GAS & ENERGY L. 155, 156 (2008-2009) (footnote omitted).

[6] The Leases were entered into by individuals, married couples acting jointly, and trustees acting on behalf of trusts.

otherwise operating for oil and gas and their constituents" during the lease term.

App'x 32. It undertook no obligation, however, to drill.

Victory shared its leasehold interests with Mega. In July 2010, Inflection

assumed from Mega the operational rights and responsibilities under most of the

Leases.[7]

Each of the Leases contains an identical "habendum clause."[8] This clause

establishes the period during which the Energy Companies may exercise the

drilling rights granted by the Lease. The Leases' habendum clauses contain both

a five-year "primary term," and an option for a "secondary term."[9] Each clause

provides:

> It is agreed that this lease shall remain in force for a primary
> term of FIVE (5) years from the date hereof and as long
> thereafter as the said land is operated by Lessee in the
> production of oil or gas.

---

[7] Inflection did not assume operational rights to the Leases entered into by the Beardslees, *see Beardslee*, 904 F. Supp. 2d. at 217, but this factual variation does not affect our analysis.

[8] A habendum clause, which is "typically found in standard oil and gas leases" such as those at issue here, is used to "fix the duration of such a lease." *Wiser v. Enervest Operating, L.L.C.*, 803 F. Supp. 2d 109, 113 n.3 (N.D.N.Y. 2011). These clauses typically "establish a definite (or primary) term in which the lessee [is] permitted to develop [] property, with an option for an indefinite secondary term permitting the lessee to reap the long-term value and return on the money spent developing the property during the primary term." *Id.* at 118.

[9] Some of the Leases were extended for additional five-year primary terms, *Beardslee*, 904 F. Supp. 2d at 217, but the extension does not alter the operative legal analysis.

App'x 32 ¶ 1.

In addition, each Lease contains what the parties refer to as a *force majeure* clause, which speaks to delays and interruptions in drilling. That clause provides, in relevant part:

> If and when drilling . . . [is] delayed or interrupted . . . as a result of some order, rule, regulation . . . or necessity of the government, or as the result of any other cause whatsoever beyond the control of Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding. All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor Lessee held liable in damages for failure to comply therewith, if compliance is prevented by, or if such failure is the result of any such Law, Order, Rule or Regulation.

App'x 33 ¶ 6.[10]

## 2. Applicable State Statutory Law and Regulatory Actions

Article 23 of the New York Environmental Conservation Law, "Mineral Resources," governs oil and gas production in the State of New York. N.Y. Envtl.

---

[10] Although the parties refer to this clause as a "*force majeure* clause," it is not designated as such in the Leases and may be amenable to other labels. *Cf.* BLACK'S LAW DICTIONARY 718 (9th ed. 2009) (defining a *force majeure* clause as a "contractual provision allocating the risk of loss if performance becomes impossible or impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled"). Because both parties refer to this clause as a *force majeure* clause, however, we continue to do so here for ease of reference. Our use of the phrase "*force majeure*" should not be understood as an affirmation of the characterization's substance.

Conserv. Law § 23-0101 *et seq.* Article 8 of the New York Environmental Conservation Law, "Environmental Quality Review," governs how state agencies address the environmental effects of their actions, including their actions with respect to oil and gas production. N.Y. Envtl. Conserv. Law § 8-0101 *et seq.* Enacted in 1975 and codified in Article 8, the State Environmental Quality Review Act ("SEQRA") "represents an attempt to strike a balance between social and economic goals and concerns about the environment." *Matter of Jackson v. N.Y. State Urban Dev. Corp.*, 67 N.Y.2d 400, 414 (1986). SEQRA requires that New York State agencies "prepare, or cause to be prepared . . . an environmental impact statement ['EIS'] on any action . . . which may have a significant effect on the environment." N.Y. Envtl. Conserv. Law. § 8-0109(2). When "separate actions hav[e] generic or common impacts," regulations issued pursuant to SEQRA permit agencies to prepare a "generic EIS" ("GEIS") assessing the environmental impacts of those actions. N.Y. Comp. Codes R. & Regs. tit. 6, § 617.10(a)(3). If, after issuing a GEIS, an agency proposes to take actions not addressed by the GEIS but that might significantly and adversely affect the environment, it must prepare either a supplemental GEIS ("SGEIS") or a site-specific EIS. *Id.* § 617.10(d)(4).

8

In 1992, the New York State Department of Environmental Conservation (the "Department" or "DEC") issued a GEIS that addressed the environmental impact of conventional drilling techniques then in use.[11]  The 1992 GEIS described "water-gel fracs" as the most common "stimulation technique" then employed to derive gas from the shale formation.  That technique required using approximately "twenty to eighty thousand gallons of fluid" in a stimulation operation.  1992 GEIS at 9-26.

More recently, however, the techniques available for extracting gas have undergone a dramatic transformation as high-volume hydraulic fracturing combined with horizontal drilling has become feasible.  HVHF — also commonly known as "fracking" — is "an unconventional drilling technology which involves the injection of more than a million gallons of water, sand, and chemicals at high pressure down and across into horizontally drilled wells as far as 10,000 feet below the surface."  *Beardslee*, 904 F. Supp. 2d at 216 n.4.  "The pressurized mixture causes the rock layer . . . to crack . . . . [and the] gas to flow

---

[11]*Generic Envtl. Impact Statement on Oil, Gas, and Solution Mining Regulatory Program (GEIS)*, N.Y. STATE DEP'T OF ENVTL. CONSERV., (1992) 9-26, *available at* ftp://ftp.dec.state.ny.us/dmn/download/geismaster.pdf (last visited July 29, 2014) (the "1992 GEIS").

into the well." *Id.*; *see generally Wallach v. Town of Dryden,* __ N.Y.3d __, 2014 WL

2921399 (N.Y. June 30, 2014).

The technological development, not surprisingly, was accompanied by

increased interest in obtaining permits for the combined use of horizontal

drilling and HVHF. On July 23, 2008, in response to these paired developments,

then-Governor David Paterson directed the Department to update and

supplement the 1992 GEIS (the "2008 Directive"). He instructed the DEC to

"ensure that it is suitable to address potential new environmental impacts from

drilling, including horizontal drilling in Marcellus shale formations."[12] The

Energy Companies allege that this 2008 Directive marked the beginning of the

Moratorium.[13]

Over one year later, on September 30, 2009, the Department issued a draft

Supplemental GEIS (the "Draft SGEIS"), which quickly received extensive public

comment and generated vigorous controversy.[14] On December 13, 2010,

---

[12] Memorandum filed with New York State Senate Bill Number 8169-A (July 21, 2008), *available at* http://iarchives.nysed.gov/dmsBlue/viewImageData.jsp?id=172078 (last visited July 29, 2014).

[13] The New York Court of Appeals recently acknowledged the existence of a moratorium on "high-volume hydraulic fracturing combined with horizontal drilling." *Wallach,* 2014 WL 2921399, at n.1.

[14] *Draft SGEIS on the Oil, Gas and Solution Mining Regulatory Program (September 2009),* N.Y. STATE DEP'T OF ENVTL. CONSERV., *available at* http://www.dec.ny.gov/energy/58440.html

Governor Paterson issued Executive Order No. 41, entitled "Requiring Further Environmental Review of High-Volume Hydraulic Fracturing in the Marcellus Shale" (the "2010 Order"). N.Y. Comp. Codes R. & Regs. tit. 9, § 7.41. In the 2010 Order, the Governor observed that "tens of thousands of citizens, landowners, local governments, [and] large and small businesses . . . have expressed their heartfelt support for or opposition to the new technology." *Id*. He instructed the DEC to revise the Draft SGEIS and address "comprehensively the environmental impacts associated with high-volume hydraulic fracturing combined with horizontal drilling" in a prescribed timeframe. *Id*. He further "recogniz[ed] that, pursuant to SEQRA, no permits [could] be issued" by the State before "the completion of a Final SGEIS." *Id*.

In response to these developments, Inflection sent notices of extension to the Landowners, asserting that New York's regulatory actions constituted a *force majeure* event under the Leases, extending the Lease terms. On September 7, 2011, the Department released a Revised Draft SGEIS. That day, it also issued a press release informing the public that "[n]o permits for [HVHF] will be issued until the SGEIS is finalized and [the Department] issues the required Findings

(last visited July 29, 2014).

11

Statement." App'x 158. As of this writing, the Department has yet to release a Final SGEIS.

### 3. Prior Proceedings

On February 8, 2012, the Landowners filed this declaratory judgment action in the United States District Court for the Northern District of New York. They subsequently sought summary judgment on their claims, alleging that the Energy Companies did not drill any wells on the Properties since entering into the Leases, and that the Leases had therefore expired at the end of their five-year primary terms. According to the Landowners, the Energy Companies could have acquired permits that would allow drilling on the Properties during the primary terms using the conventional drilling methods described in the 1992 GEIS. They argued that nothing precluded the Energy Companies from performing any obligation under the Leases — to the extent there was any obligation to drill at all. Finally, they argued that, in any event, the habendum clauses could not be modified by operation of the *force majeure* clause, even if the Moratorium was correctly classified as a *force majeure* event. The Landowners therefore sought a declaration that the Leases had expired.

The Energy Companies cross-moved for summary judgment, arguing primarily that the Moratorium instituted by the Governor's 2008 Directive

prevented them from using the combination of horizontal drilling and HVHF that they characterized as the only "commercially viable" method of drilling in the Marcellus Shale during the Leases' primary terms.[15] Therefore, they contended, the Moratorium constituted a *force majeure* event; it modified the habendum clause, and it worked to extend the Leases' primary terms until the State lifted the Moratorium, whenever that might be.

On November 15, 2012, the District Court granted summary judgment to the Landowners, declaring all of the Leases expired. The court found that the so-called *force majeure* clause was not triggered by the Moratorium and did not extend the Leases. It declined to rule on whether a *force majeure* event occurred, explaining that even if it did, the *force majeure* clause would have no effect on the habendum clause and the Lease terms. It reasoned that the "invocation of a force majeure clause to relieve [the Energy Companies] from their contractual duties is unnecessary," because the Leases simply provide the Energy Companies with the option — rather than the obligation — to drill. *Beardslee*, 904 F. Supp. 2d at 220. It also concluded that Governor Paterson's 2008 Directive did not frustrate the purpose of the Leases, because the Energy Companies could drill using

_____

[15] Although the Energy Companies rely on "commercial viability" as a critical factor in their analysis, they offer no definition of the phrase or the measure of either cost or profitability that they envision the phrase to convey.

conventional methods.  *Id*. at 221.  While acknowledging that the Energy

Companies adduced evidence supporting their position that HVHF was

currently the only "commercially viable" method of drilling and production in

the Marcellus Shale, the court found that "mere impracticality" was not enough

to trigger the *force majeure* clause and extend the Lease terms.  *Id.* at 220 (internal

quotation marks and alteration omitted).

The Energy Companies appeal.

## DISCUSSION[16]

### 1.    **Standard for Certification**

Second Circuit Local Rule 27.2 provides a means by which our Court may

certify questions of New York law to the New York Court of Appeals.  The

regulations of the New York Court of Appeals permit that Court, in its

discretion, to entertain dispositive questions certified to it for resolution.

"Certified questions must be 'determinative questions' that are 'involved in a

case pending before [us] for which no controlling precedent of the Court of

Appeals exists.'"  *In re Thelen LLP*, 736 F.3d 213, 224 (2d Cir. 2013) (citing N.Y.

Comp. Codes R. & Regs. tit. 22, § 500.27(a); N.Y. Const. Art. 6, § 3(b)(9)).

---

[16] We review a district court's grant of summary judgment *de novo*.  *Isabella v. Koubek*, 733 F.3d 384, 387 (2d Cir. 2013).

"We have deemed certification appropriate where state law is not clear and state courts have had little opportunity to interpret it, where an unsettled question of state law raises important issues of public policy, where the question is likely to recur, and where the result may significantly impact a highly regulated industry." *Cruz v. TD Bank, N.A.*, 711 F.3d 261, 267-68 (2d Cir. 2013) (internal quotation marks omitted). Before we may certify, however, we make three inquiries: "(1) whether the New York Court of Appeals has addressed the issue and, if not, whether the decisions of other New York courts permit us to predict how the Court of Appeals would resolve it; (2) whether the question is of importance to the state and may require value judgments and public policy choices; and (3) whether the certified question is determinative of a claim before us." *Barenboim v. Starbucks Corp.*, 698 F.3d 104, 109 (2d Cir. 2012).

### 2. **Application**

Under New York law, "[o]il [and gas] leases or contracts stand on an entirely different basis from any other leasehold agreements." *Conkling v. Krandusky*, 127 A.D. 761, 766, 112 N.Y.S. 13 (4th Dep't 1908). Oil and gas leases are entered into "in the context of a highly technical industry, which employs distinct terminology used by those in the business." *Wiser v. Enervest Operating, L.L.C.*, 803 F. Supp. 2d 109, 117 (N.D.N.Y. 2011). Currently, however, there is a

"dearth of authority in New York relating to oil and gas leases" such as those now at issue. *Id.* Thus, although this case turns on questions of contract interpretation that may not be the typical material for certification, because the dispute arises in a relatively underdeveloped area of law and because it implicates matters of public policy integral to the economic and environmental wellbeing of the State of New York, we certify the following questions to the New York Court of Appeals, based on the motion for summary judgment and accompanying submissions: First, whether, in the context of an oil and gas lease, the State's Moratorium amounted to a *force majeure* event; and second, if so, whether the *force majeure* clause modifies the habendum clause and extends the primary terms of the Leases. We explain below why these questions admit of no clear answer under New York law, and why they warrant certification.

### a. Was the Moratorium a *force majeure* event?

Virtually every Lease was executed more than five years before the Landowners brought suit in 2012. The Energy Companies never drilled on any of the Landowners' Properties, let alone produced oil or gas. Absent some

16

exception or modification to the primary terms in the habendum clauses, therefore, each Lease had expired by 2012.[17]

The first issue, then, is whether the Moratorium qualified as a *force majeure* event. The *force majeure* clause provides, in relevant part, that when an "order, rule, regulation, requisition or necessity of the government," or "other cause" that is "beyond the control of Lessee" causes "delay or interruption" of "drilling or other operations" under the Lease, "the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding." App'x 33 ¶ 6.

Determining whether the Moratorium was a *force majeure* event under the Leases requires examination of whether regulatory actions barring "commercially viable" drilling — but not all drilling — can constitute such an event. The Energy Companies allege and Landowners do not seriously dispute that the combined use of HVHF and horizontal drilling is currently the only "commercially viable" — read "profitable" — method of drilling in the Marcellus Shale. But the Leases — almost all of which appear to have been executed before

---

[17] The parties do not address whether, when the Governor issued the July 23, 2008 Directive, the five-year primary terms of those Leases that were executed before July 23, 2003, had already expired. We do not address that question here, because there is no dispute that certain Leases — that is, those signed after July 23, 2003, and those whose primary terms had been extended by agreement of the parties — were still in effect as of July 23, 2008.

current fracking methods were fully developed — do not explicitly note the type of drilling they permit. Nor do they excuse the Energy Companies from paying rent during the primary period if drilling produces nothing, or from paying royalties if the royalties due pale in comparison to those that might be derived from a fracked well.[18] Nevertheless, the Energy Companies argue that the purpose of every oil and gas lease, including theirs, is to achieve paying production, and that requiring them (in effect) to drill at a loss would violate the implied covenant of good faith and fair dealing that New York law acknowledges. *See* 3 Howard R. Williams & Charles J. Meyers, OIL AND GAS LAW § 604.5 (abridged ed. 1984) ("[T]he objective of the [oil and gas] lease is not merely to have oil or gas flow from the ground but to obtain production that is commercially profitable to both parties."); *LaBarte v. Seneca Res. Corp.*, 285 A.D.2d 974, 975 (4th Dep't 2001) ("[E]very contract contains an implied covenant of good faith and fair dealing.").

---

[18] The Landowners allege that several wells are operating in the Marcellus Shale using conventional drilling methods. They do not address, however, and the record does not reflect, whether those wells are profitable. The Energy Companies argue that the Landowners' proof that conventional well-drilling permits were available is inadequate, but they appear to dispute only the profitability of drilling in the Marcellus Shale using conventional techniques, rather than the availability of permits to drill using conventional techniques in that region.

Where the Lease contains no express requirement or condition that drilling be profitable, however, and when conventional well-drilling and other oil and gas "operations" appear still to be possible, the Moratorium might not be a *force majeure* event. Generally speaking, in New York, a *force majeure* clause must "specifically include[] the event that actually prevents a party's performance" in order to excuse that performance. *Kel Kim Corp. v. Central Mkts., Inc.*, 70 N.Y.2d 900, 902-03 (1987). As described above, the Leases contain no "commercial viability" term. Reading such a term into the Leases as the Energy Companies propose might therefore violate New York law while encumbering the Landowners' Properties indefinitely.[19] Given the dearth of New York authority in the context of oil and gas leases, we are reluctant to proceed without further guidance from the Court of Appeals.

### b. Does the *force majeure* clause modify the habendum clause?

Our reluctance to address whether the Moratorium qualifies as a *force majeure* event is compounded by a further, and in some respects more fundamental question: whether this *force majeure* clause modifies the primary term set by the habendum clause.

---

[19] In a parallel suit, the same District Court rejected a similar argument by other lessees that the Moratorium was a *force majeure* event because it prevented drilling in the Marcellus Shale in a "commercially practicabl[e] manner." *See Aukema*, 904 F. Supp. 2d at 210. The parties withdrew their appeal of that decision in September 2013.

The habendum clause provides that the Lease "shall remain in force" for the five-year primary term and "as long thereafter as the said land is operated by Lessee in the production of oil or gas." App'x 32 ¶ 1. The *force majeure* clause provides that if drilling is "delayed or interrupted" for an enumerated reason, "the time of such delay or interruption shall not be counted against the Lessee, *anything in this lease to the contrary notwithstanding*." App'x 33 ¶ 6 (emphasis added). It is unclear whether, under New York law, this clause modifies the primary term of the habendum clause when the habendum clause is not expressly made subject to the other terms of the Lease.

The parties have directed us to no New York case that addresses the relationship between a habendum clause and a *force majeure* clause in an oil and gas lease. One federal court, applying New York law, predicted, "[W]here . . . the language of the habendum clause clearly makes that provision 'subject to' other provisions in the agreement, . . . the life of the lease may be subject to modification." *Wiser*, 803 F. Supp. 2d at 121. Other jurisdictions that have addressed this issue provide some additional guidance. For example, one California court determined that a *force majeure* event did not modify the primary term of a lease. First, it interpreted an oil and gas lease as "both a conveyance and a contract." *San Mateo Cmty. Coll. Dist. v. Half Moon Bay Ltd. P'ship*, 65 Cal.

20

App. 4th 401, 409 (Cal. Ct. App. 1998).  The *San Mateo* court explained, "The

conveyancing elements are the granting and habendum clauses, and the

contractual elements include the provisions that pertain to the lessee's

obligations with respect to exploring, drilling, and producing operations."  *Id.*

Then, it followed the "long-established rule" of California law that

> any language in a deed, subsequent to the granting and
> habendum clauses, may not modify, cut down or control
> those clauses unless such clauses [granting and habendum]
> incorporate the additional language by express reference.

*Id.* at 412 (internal quotation marks omitted).  That court thus found that — in

part because the habendum clause did not expressly incorporate the *force majeure*

clause — the *force majeure* clause at issue did not modify the habendum clause.

*Id.*

It is undisputed that the habendum clause in this case contains no such

language.  The Landowners therefore claim that the primary terms of the Leases

are unaffected by the *force majeure* clause.[20]

---

[20] The Energy Companies argue that the Landowners' interpretation of the Leases
renders meaningless the *force majeure* clause's phrase, "the time of such delay or interruption
shall not be counted against Lessee."  The Landowners counter that the clause retains force,
because it would apply during the Leases' *secondary* terms, when the Energy Companies have
an "obligation to operate in the production of oil or gas" to prevent the Leases from
terminating.  Appellees' Br. 48.  We leave the resolution of that question to the Court of
Appeals.

The Energy Companies contend, however, that it is irrelevant that the habendum clause does not make itself subject to the other Lease terms because the *force majeure* clause applies, "anything in this lease to the contrary notwithstanding." App'x 33 ¶ 6. Under New York contract law, "clauses similar to the phrase 'notwithstanding any other provision' trump conflicting contract terms." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) (alteration omitted). The Energy Companies thus argue that the *force majeure* clause modifies the habendum clause, regardless of the absence of any "subject to" language in the habendum clause. Indeed, in *San Mateo*, the court suggested that if the *force majeure* clause contained language purporting to modify the habendum clause itself, then the case may have come out differently. 65 Cal. App. 4th at 412-13.

New York law offers no guidance on whether a *force majeure* event would extend the primary terms of the Leases. Given the importance of this issue and the likelihood that it will recur in other cases involving similar oil and gas leases, we think it prudent to leave this issue to the New York Court of Appeals.

### c. Certification of these two questions to the New York Court of Appeals

As noted above, before we may certify, we make three inquiries: "(1) whether the New York Court of Appeals has addressed the issue and, if not, whether the decisions of other New York courts permit us to predict how the Court of Appeals would resolve it; (2) whether the question is of importance to the state and may require value judgments and public policy choices; and (3) whether the certified question is determinative of a claim before us." *Barenboim*, 698 F.3d at 109.

In our view, the two questions that we certify satisfy all three inquiries. First, the New York Court of Appeals has not decided the questions before us. Nor has any New York state case of which we are aware resolved these issues. *See* George A. Bibikos & Jeffrey C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States*, 4 TEX. J. OIL GAS & ENERGY L. 155, 191 (2008-2009) ("New York presents essentially a blank slate as to all significant oil and gas lease issues."). Second, these questions are of great importance to the State of New York. There is substantial interest in the use of HVHF in the Marcellus Shale, and — in addition to the Landowners in this case — many New York landowners could be affected by this ruling, both as to currently effective leases

and as to leases that may be entered into in the future. And finally, the certified questions are determinative of the claims in this case. The Court's answer to our certified questions would resolve (1) whether the State's Moratorium was a *force majeure* event; and (2) whether the Energy Companies may invoke the *force majeure* clause to extend the primary terms of the Leases, thus determining whether the Leases have or have not expired.

We therefore find that each factor weighs in favor of certifying these questions to the New York Court of Appeals.

**CONCLUSION**

We certify the following questions to the New York Court of Appeals based on the motion for summary judgment and accompanying submissions:

1. Under New York law, and in the context of an oil and gas lease, did the State's Moratorium amount to a *force majeure* event?

2. If so, does the *force majeure* clause modify the habendum clause and extend the primary terms of the leases?

We invite the New York Court of Appeals to expand, alter, or reformulate those questions as it deems appropriate.

It is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a certificate in the form attached, together with a

24

copy of this Opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals or once that Court declines to accept certification.

## CERTIFICATE

We hereby certify the foregoing questions to the New York Court of Appeals pursuant to Second Circuit Local Rule 27.2 and New York Compilation of Codes, Rules, and Regulations, title 22, section 500.27(a).